196 So.2d 255

Herman A. THOMPSON

v.

Phil A. ST. AMANT.

No. 48184.

Feb. 20, 1967.

Rehearing Denied March 27, 1967.

Kleinpeter & Barnett, Baton Rouge, for relator.

Russell J. Schonekas, New Orleans, for defendant-respondent.

SUMMERS, Justice.

This action for $150,000 in damages for an alleged libel was instituted by Herman A. Thompson, a deputy sheriff of the parish of East Baton Rouge, against Phil A. St. Amant, a retired Army officer and business man of that parish.

The trial court found that the plaintiff, Thompson, had made out his cause of ac-tion and, accordingly, condemned the defendant, St. Amant, to pay $5,000 as damages. Upon proper and timely application, a new trial was granted to reconsider the case in the light of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L. Ed.2d 686 (1964), which had been handed down in the meantime. After reconsideration the trial judge reinstated his original judgment. On appeal the First Circuit reversed, and we granted review on Thompson's application.

The petition alleges that, on June 27, 1962, St. Amant, who was then a candidate for the office of United States Senator, appeared on a television program in Baton Rouge and delivered a political campaign address which was also reduced to writing and distributed to the press and other news media.

In the beginning of his speech St. Amant said:

"I have a story to reveal tonight which is so unusual that I have bought this time on the television to inform the public. This story involves a well-documented criminal, and ex-convict who became a labor chieftain. It involves misuse and theft of union funds, dealings with Communist officials of Cuba, a criminal conspiracy to destroy evidence and the destruction of that evidence; death resulting from the commission of a felony and a second death by a hit and run by a union car."

The address thereafter consisted principally of the reading by St. Amant of a transcript of an interview which he had previously had with one J. D. Albin, a member of the local Teamsters' Union. The interview was in question and answer form, with St. Amant asking the questions which Albin answered. At St. Amant's urging, Albin had sworn to the correctness of the facts he recounted, and St. Amant had possession of the affidavit in written form.

By its content the speech was unmistakably designed to disclose Albin's knowledge of illegal, unsavory and criminal actions by E. G. Partin, business agent of the local Teamsters' Union. In the speech St. Amant claimed Senator Russell B. Long, his opponent and the incumbent United States Senator, had recommended Partin to James Hoffa, the union president. By this disclosure he sought to disparage his opponent.

Included among Partin's activities, according to Albin's statements which St. Amant read, was a visit by Partin with Fidel and Raoul Castro in Cuba during November 1960. St. Amant quoted Albin as saying that Partin was responsible for the negotiation of a labor contract in Baton Rouge, giving up many wage benefits and surreptitiously continuing a practice of longer working hours contrary to the interest of union members. Partin was accused of using union funds for his personal

benefit, to pay house notes and the rent for his girl friend's car.

Albin related that Partin took "numerous amounts of money out of the cash drawer during the week and at the end of the week he made this up by making a check out to someone else who would endorse it and they would deposit it into the union fund." Albin then relates, in response to St. Amant's questions, that these practices prompted a local union member to write a letter to Arthur Goldberg, then Secretary of Labor, with a copy to James Hoffa, asking for an investigation of Partin's local union by the union hierarchy. According to Albin, when Partin learned of this he became "pretty riled up" and enlisted four members of the union to "help him get rid of the safe" which contained the union records. Albin continued:

"Now, we knew that this safe was gonna be moved that night, but imagine our predicament, knowing of Ed's connections with the Sheriff's office through Herman Thompson, who made recent visits to the Hall to see Ed. We also knew of money that had passed hands between Ed and Herman Thompson * * * from Ed to Herman. We also knew of his connections with State Trooper Lieutenant Joe Green. We knew we couldn't get any help from there and we didn't know how far that he was involved in the Sheriff's office or the State Police office through

that, and it was out of the jurisdiction of the City Police."

In his narrative Albin asserted that the safe disappeared that night and that Thompson and Lieutenant Joe Green of the State Police investigated the case but nothing happened. The safe turned up "a few months later, Albin said, when a young man by the name of Forman dove off the river bridge and hit his head on the safe * * * killing himself." This death St. Amant and Albin characterized as "a death resulted (sic) from the commission of a felony." They concluded Forman's death was a "murder" for which, they implied, Partin was responsible.

Then followed statements by Albin, all of which were likewise read by St. Amant, purporting to give information from Partin's "rap sheet", revealing that Partin had been either arrested, charged or convicted for robbery, auto theft, breaking and entering, "second degree burglary", rape, and robbery with firearms. Albin charged that Partin was responsible for the death of a young soldier in Alabama, killed in a hit-and-run automobile accident while Partin was driving the offending vehicle.

St. Amant continued to read the transcript of his interview with Albin, quoting Albin's story of why A. G. Klein, a good friend and a union member, was not "testifying today." He quoted Albin as saying that Klein, who had knowledge of the "safe incident" and other illegal activities of

Partin, testified before a Federal Grand Jury in New Orleans, and that shortly thereafter Klein met his death in St. Francisville when a truck "dropped on top of him loaded with about ninety thousand pounds of sand."

St. Amant's presentation of this political address—the manner in which he expressed himself, the tone and theme of the speech, the obvious manifestation of his belief in the veracity of Albin's statements—was calculated to impress upon the reader or listener that he had confidence in Albin's charges against Partin and Thompson and that he believed them to be true. The publication was principally designed to malign the conduct of the incumbent United States Senator; but to do this it was necessary to show Partin's unsavory character and criminal record. Thompson's name was brought into the story only incidentally, yet, he was nonetheless unmistakably accused of criminal conduct.

In his petition Thompson alleged that the publication by St. Amant was false, libelous, scurrilous and malicious and was intended to belittle, degrade and ridicule him. Clearly, he alleged, the publication reflected a design and intent on the part of the defendant, St. Amant, to defame, slander and libel Thompson's good name, reputation and character before his friends, the courts and the public in general. From St. Amant's remarks, the petition alleges, the false and defamatory imputation arises that Thomp-

son was guilty of gross misconduct of a nefarious nature.

In his answer St. Amant admitted making the speech but denied that he defamed or intended to defame Thompson. He alleged that the context in which the remarks concerning Thompson were made shielded those remarks from any defamatory imputation. In the alternative, he alleged that the utterances concerning Thompson were true and their publication was for the public good. Even if not true, he alleges, there was no malice on his part.

■ As it is settled in Louisiana that the truth of a defamatory remark is generally a valid defense in a civil suit for defamation, it becomes necessary to decide initially if the remarks concerning Thompson were true. If they are shown to be true that would ordinarily end the case. If the utterances are false, however, we must then proceed to determine if they are defamatory and actionable. La.R.S. 13:3602; Deshotel v. Thistlewaite, 240 La. 12, 121 So.2d 222 (1960). Both the trial court and the Court of Appeal decided that the statements were not true, and we agree.

By his testimony at the trial, Thompson acknowledged that he first knew Partin in connection with labor disputes—to which Thompson had been assigned for duty. He got to know Partin better, he said, while investigating burglaries at the union hall. In fact, because he had been designated for special duty by the sheriff, he was required

to come in contact with almost all of the union business agents in Baton Rouge. He knew them all by their first names and readily conceded that he received funds from Ed Partin when he picked up a check every year for the Baton Rouge Kids' Baseball Clinic. The United Mine Workers, pipefitters', electricians', carpenters', and other unions and several civic and charitable organizations were also solicited by him.

Other duties assigned to him included supervising a bell-ringing campaign for the Salvation Army, soliciting for the Volunteers of America, the March of Dimes, the Cystic Fibrosis Fund, the Elks Club and the Lions' Club. He assisted in these civic and charitable undertakings as a public service. And except for such solicitations, he had no connection with Partin other than as a law enforcement officer.

■ An effort was made to discredit Thompson's testimony that he had only received "checks" from Partin in the solicitations. Partin's former secretary, Marjorie Ann Smith, testified that Partin once gave her an envelope for delivery to Thompson. She stated that she and Jeanette Fletcher, another employee in the union office, opened the envelope and saw five twenty-dollar bills. According to Marjorie Ann Smith's testimony, Jeanette Fletcher handed the money to Thompson in a sealed envelope. Thompson, however, categorically denied having received any cash. The trial judge and the Court of Appeal rejected the

Smith woman's testimony and accepted Thompson's version that no money passed from Partin to him, other than checks representing donations by the union to charitable and civic organizations. Since Marjorie Ann Smith's testimony was rejected and Jeanette Fletcher did not testify, there is no evidence to support the charge that "money passed" from Partin to Thompson. On this vital issue of fact, which bears so heavily on our decision, we agree with the trial court and the Court of Appeal.

Moreover, as the determination of this issue involves the credibility of the witnesses Thompson and Smith and because there is no other evidence upon which a contrary result could be reached, the record will not support reversal of the findings of both the trial court and the Court of Appeal. Not only do we find that the remarks about Thompson were false, we find that the record reflects impressively his integrity and good character.

Thompson admitted that checks passed to him from Partin as a solicitation for the Baton Rouge Kids' Baseball Clinic, but the remarks contained in St. Amant's publication say much more. Sheriff Bryan Clemmons, Thompson's employer, found it necessary to defend Thompson against the charges contained in the speech. For many citizens called the sheriff for an explanation because they believed that St. Amant had accused Thompson of taking a pay-off from

Partin. A neighbor who heard the broadcast told Thompson that "some man" had called him "some kind of thief and all kinds of names." The meaning the controverted remarks convey to the average reader is utterly defamatory of Thompson.

 Preceded and followed as the remarks about Thompson were by the numerous charges of criminal conduct on the part of Ed Partin, linked as those words were with the sequence of events concerning the theft of union funds and the destruction of the safe, it is difficult to ascribe to the words "We also knew of money that had passed hands between Ed and Herman Thompson * * * from Ed to Herman" any meaning except that they charged Thompson with taking a criminal pay-off from Ed Partin. Charging that "we knew we couldn't get any help from there", in the context in which it was used, was a charge that Thompson would aid and abet the wrongdoer rather than perform his duty and enforce the law or otherwise help prevent the commission of a crime. And it is fair to conclude that the defamatory character of these words was in all probability heightened by a dramatic oral presentation.

These are statements of fact. They cannot be said to be expressions of opinion or comments within the rule of "fair" comment. 1 Harper & James, Torts § 5.26 and § 5.28 (1956).

■ It is one thing to state an innocent fact; it is another to state it in such a manner that it charges criminal conduct to the average listener and to a significant segment of the community. In the latter instance, the party who utters the words bears the burden of establishing either their truth or some justification sanctioned by law; otherwise he must bear the legal consequence of his indiscretion and the injury suffered by the victim of his remarks. In a civil suit those consequences are damages measured in money. Lewis v. Louisiana Weekly Publishing Co., 189 La. 281, 179 So. 315 (1938).

In keeping with this principle, this court in recent years said that:

"A mere insinuation is as actionable as a positive assertion, if the meaning is plain; and if the words used, when taken in their ordinary acceptation, convey a degrading imputation, no matter how indirectly, they are libelous—it matters not how artfully their meaning is concealed or disguised." Madison v. Bolton, 234 La. 997, 1010, 102 So.2d 433, 437–438 (1958).

■ The guarantees of freedom of speech and of the press embodied in our state and federal constitutions, though designed to assure broad freedom for the expression of opinion, do not permit unrestrained license or confer the right upon an individual to speak or print whatever he chooses without bearing the responsibility

for the utterance. Where the published matter is false, malicious and injurious, full responsibility for the damage it may cause is exacted by the law, unless a proper defense or justification is established. Kennedy v. Item Co., 213 La. 347, 34 So.2d 886 (1948); Fitzpatrick v. Daily States Publishing Co., 48 La.Ann. 1116, 20 So. 173 (1896).

Realizing that these propositions would establish his legal responsibility for false and defamatory utterances, St. Amant asserts that, if we find the remarks to be false, then his defense is that Thompson was a "public official". Thus, he is prohibited from recovering damage for a defamatory falsehood relating to his official conduct, unless he proves the statement was made with "actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not. He relies upon the ruling in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) to support this contention.

In the New York Times Case, the United States Supreme Court held that, in a civil action brought by a public official for criticism of his official conduct, the First and Fourteenth Amendments to the Federal Constitution limit state power to an award of damages for a false statement "made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." See

Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964).

Thus the issue is clearly formed. At this phase of our deliberation we must decide whether Thompson, a deputy sheriff, is a "public official" within the meaning of the rule announced in the New York Times Case. We hold that he is.

▆ A deputy sheriff is a state officer whose position is created by the legislature. His appointment is provided for by Title 33, Section 1433, of the Revised Statutes of this State. State v. Mayeux, 228 La. 6, 81 So.2d 426 (1955); Williams v. Guerre, 182 La. 745, 162 So. 609 (1935). Article 19, Section 1, of the Louisiana Constitution of 1921 requires that all officers of the State shall take the prescribed oath. This constitutional mandate has been implemented by the legislature to require deputy sheriffs to take that oath (La.R.S. 33:1433). The relation between a sheriff and his deputy, then, is an "official" and not a "private" relation. The deputy is a representative of the sheriff in his official capacity; he is a public officer or official whose authority and duty are regulated by law. So far as the public is concerned, the acts of a deputy are the acts of the sheriff himself.

▆ However, because Deputy Sheriff Thompson is technically a "public official" under Louisiana law, it does not follow that the rule announced in the New York Times Case applies to this case. The real test is whether the official has, or appears to the public to have, "substantial responsibility for or control over the conduct of governmental affairs." Rosenblatt v. Baer, 383 U.S. 75, 85, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). See also Bertlesman, Libel and Public Men, 52 A.B.A.J. 657 (1966).

▆ The deputy acts for the sheriff, and his acts are the acts of the sheriff. The sheriff's position in government vests him and his deputies with "substantial responsibility for or control of governmental affairs" at least where law enforcement and police functions are concerned. The New York Times rule applies, therefore, to this deputy sheriff. Gilligan v. King, 48 Misc. 2d 212, 264 N.Y.S.2d 309 (1965); cf. Henry v. Collins, 380 U.S. 356, 85 S.Ct. 992, 13 L. Ed.2d 892 (1965) and Pape v. Time, Inc., 354 F.2d 558 (7th Cir. 1965).

It remains, in the light of the conclusions we have already reached, to determine whether the false and defamatory remarks concerning Thompson were uttered by St. Amant with "reckless disregard" of whether they were false or not.

The most important witness to the crucial fact in this regard was Marjorie Ann Smith. It was she who testified that, following Partin's instructions, Jeanette Fletcher gave an envelope containing five, twenty-dollar bills to Thompson. Her testimony is relied upon to establish the truth of the statement that "pay-off" money passed from Partin

to Thompson or, at least, to relieve St. Amant of any charge that his utterances were in "reckless disregard" of whether they were false or not. Yet the first time St. Amant contacted her to verify this occurrence was after the lawsuit was filed and, of course, long after the political address had been televised and otherwise widely disseminated. Jeanette Fletcher, the only other witness to the occurrence, was not called to testify on this vital issue, and her failure to do so was not explained.

Having no personal knowledge of Thompson's activities, St. Amant relied upon Albin's sworn statement to verify the truth of the defamatory matter. Albin, however, did not testify. (St. Amant explained that he was ill and in the hospital.) Nowhere in the record is the reliability or the reputation for truth or veracity of Albin shown.

Although St. Amant testified that he had other affidavits to support some of the facts detailed in his address, none were produced. When asked if he gave any consideration to the effect the speech would have on Thompson, he replied that Thompson "wasn't even on my mind." Partin was his main concern; and in his zeal to show a bad character and background in Partin and to link him to his opponent, he gave no consideration whatsoever to Thompson. He was heedless of the effect his address would have on Thompson or of the truthfulness or not of the statements concerning him.

St. Amant's testimony indicates that he was laboring under the mistaken impression that because the words concerning Thompson were not in themselves defamatory he could not be involved in what might be implied from those words, such as the charge of criminal conduct which was implicit in them because of the context in which they were used. St. Amant felt he would be shielded from any responsibility because he was quoting Albin. In his own words, "Herman Thompson wasn't even on my mind." It was reckless error for him to take this position. Such a faulty assumption was in utter disregard of whether the remarks about Thompson were true or false.

█ We think the record contains adequate proof of actual malice on the part of St. Amant—that is, a reckless disregard as to whether the statements concerning Thompson were true or not.

█ Although "public men are, as it were, public property",[1] we do not feel that the freedom of "uninhibited, robust, and wide-open"[2] debate on public issues guaranteed by the First Amendment to the Federal constitution can "sensibly be turned into an open season to shoot down the good name of

1. Beauharnais v. People of State of Illinois, 343 U.S. 250, n. 18, 72 S.Ct. 725, 96 L.Ed. 919 (1952).

2. New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

any man who happens to be a public servant."[3]

No proof of damages was necessary, and we do not regard the verdict as excessive.

For the reasons assigned, the judgment of the Court of Appeal is reversed, and the judgment of the trial court is reinstated and made the judgment of this court.

McCALEB, J., dissents with written reasons.

HAMLIN, J., dissents, being of the view that the result reached by the Court of Appeal is correct. See also Time v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456.

McCALEB, Justice (dissenting).

I am in disagreement with all factual and legal conclusions of the majority opinion save one—that is, that plaintiff, Thompson, is a public official whose activities come within the rule laid down by the Supreme Court of the United States in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

In the first place, it is my view that the evidence in this case clearly discloses that the *facts* related in the sworn affidavit of J. D. Albin (which affidavit was read by St. Amant on television) are substantially true. Thompson admits in his testimony that he was a good friend of the labor leader, Partin (he called him Ed and Partin called him Herman), and was a rather frequent visitor at the Union Hall. He says that he regularly visited the Hall once a week or every ten days to pass the time of day and talk to the two lady secretaries, also to use the phone and "different things like that". He received contributions from Partin for the Baton Rouge Kids' Baseball Clinic but insists that he was given checks, vehemently denying that any payments were made in cash. At first, he denied that these checks were delivered in envelopes but later admitted that, on one or two occasions, the contribution had been placed in an envelope. He said: "Once or twice there has been an envelope but I never opened it. I would bring it in and give it to Polly".[1] He

3. Tucker v. Kilgore, 388 S.W.2d 112 (Ky. 1965).

1. Polly, to whom he refers, is Mrs. Coxe, the sheriff's secretary, who, Thompson and the sheriff say, kept the record of the collections made by Thompson (he was specially assigned for this extra curricular activity by the sheriff and he solicited, besides the Teamsters, the Electricians, Carpenters, Pipefitters, United Mine Workers and several other labor unions operating within the Baton Rouge area) in the fund-raising drives for various organizations—Baton Rouge Kids' Baseball Clinic, the Baton Rouge Mothers' March, March of Dimes, Elks' Christmas Fund Baskets, the Eagles Christmas Baskets, Lions Club Light Bulb Sale, the Volunteers of America, Cystic Fibrosis and the Shrine Circus.

testified further that he never received anything other than the contributions from Partin and that, when he graduated from the F.B.I. School and had successfully cleared certain burglaries at the Union Hall, Partin sought to reward him by offering him a suit of clothes and a check as a present. However, he says he rejected the offer and reported the matter to the sheriff.

It is thus seen from Thompson's testimony that Albin's statement in his affidavit—that "We also knew of money that had passed hands between Ed and Herman Thompson * * * from Ed to Herman" was true unless it be that there is a technically factual difference in payment by check or by cash.[2]

True, the affidavit states that "money had passed hands" but in usual parlance the term is broad enough to cover payment by check as well as cash. Yet the majority opinion attaches much significance to the evidence on this score. The opinion relies heavily on the statement of Thompson, an interested witness, and rejects as false and unreliable, the testimony of Mrs. Marjorie Ann Smith, one of the secretaries at the Teamsters' Hall, an ap-

parently disinterested witness, who stated unequivocally that Partin had placed five $20.00 bills (which she saw) in an envelope which was delivered by the other secretary, Jeanette Fletcher, to Thompson under Partin's instructions.

For my part, I perceive no valid reason for the rejection of Mrs. Smith's evidence. The deduction that her testimony is unworthy of belief seems to be founded in part on the failure of St. Amant to call Jeanette Fletcher, the other secretary, who Mrs. Smith says also observed the $20.00 bills in the envelope, to corroborate Mrs. Smith's statement. But I know of no law placing such burden on St. Amant. It is not shown that he was acquainted with or had any control over Miss Fletcher who, as the record shows, was acquainted with Thompson and presumably available to him as a witness. Actually, since this phase of the case reduces itself to the affirmative statement of Mrs. Smith that cash was passed and the denial of Thompson that he received cash (the payment being made by check) it is to be wondered why Thompson did not call his friend, Partin, to the stand to verify his statement. Also, he could have called Mrs. Coxe to whom he alleg-

According to Sheriff Clemmons, it came as no surprise to him that some of the members of the Teamsters' Union (evidently meaning Albin and others) might be aware that Partin was giving Thompson money for some purpose and he further testified that Thompson had received cash as well as checks in his solicitation activities from other sources but not from Partin.

2. Indeed, Thompson indicates that he did not know whether the payments enclosed in envelopes were made by check or cash, for he testified in rebuttal that, when the payment was in an envelope, " * * * I just brought the envelope in and gave it to Polly and didn't bother to open it."

edly delivered all checks from the Teamsters, but no cash, according to Thompson and the sheriff.

Moreover, I note that the majority opinion states that "The trial judge and the Court of Appeal rejected the Smith woman's testimony and accepted Thompson's version that no money passed from Partin to him, other than checks representing donations by the union to charitable and civic organizations". I have carefully examined the opinions of the trial judge and the Court of Appeal (see 184 So.2d 314) and find no ruling by either court rejecting the verity of Mrs. Smith's evidence.[3]

But, be this as it may, it makes no essential difference whether the payment was made in cash or by check. In either case the affidavit that money had passed between Partin and Thompson is an admitted fact. The only suggested difference is that Albin, the author of the affidavit, after relating that Partin withdrew money from the Union funds for his own use and later assertedly arranged for the disappearance of the safe containing the

Union records (the accuracy of this part of Albin's affidavit is not challenged), expressed the opinion that, because of Partin's connection with a certain State Trooper, there would be no help obtained from the state police office for an investigation of the irregularities and that probably no assistance would come from the sheriff's office, in view of the close relationship between Partin and the plaintiff, Thompson. If Albin was incorrect in this deduction, this, under the New York Times Co. v. Sullivan rule, would not have warranted recovery even as to Albin (who, of course, is not a party defendant in this case) because the First Amendment to the Federal Constitution, which delimits by operation of the 14th Amendment the State's right to award damages for civil libels in matters involving public officials, applies only to those matters in which the injured official proves actual malice, i. e., that the publication is made with knowledge that it is false or in reckless disregard of whether it was false or true.

The New York Times rule, as I understand it, authorizes civil libel recovery by

---

3. The trial judge rested his original opinion on the predicate that the affidavit of Albin was libelous per se. His only reference to Mrs. Smith's testimony is that she stated that money " * * * was left in an envelope from Mr. Partin to Mr. Thompson and that he picked up the same." As to this, the judge ruled, in effect, that it was immaterial whether the payments were made in cash or by check since all money paid was received " * * * purely in connection with drives put on by some charitable institution * * * "; as avouched by the sheriff and Thompson.

The Court of Appeal recited the substance of Mrs. Smith's testimony but made no finding as to her credibility. Indeed, such a finding would have been superfluous, in view of the court's conclusion that Thompson could not recover under the rulings in the New York Times and Garrison cases. ...

public officials for defamatory remarks based on facts known to be false. It does not extend this right of redress to the free expression of opinion, no matter how erroneous, when such conclusion is drawn from true statements of fact. In other words, in view of the fact that the statement that money had passed from Partin to Thompson is true, the circumstance that Albin might have been mistaken, in implying that the money or check was given for Partin's or the Union's protection by the sheriff's office, would not afford a legal ground for holding the publication actionable. For this was fair comment, however erroneous, based on substantially true facts and to hold otherwise, according to the New York Times case, would unconstitutionally trench upon the right of free speech. As was stated in Beauhornais v. People of State of Illinois, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919, and many times repeated, " * * * public men are, as it were, public property" and, in the absence of *actual* malice, an action for libel may not be maintained. See also Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) and discussion in Time v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967).

What I have heretofore said would apply only if Albin, the author of the affidavit, was the defendant in this case. But this suit is not against Albin but against St. Amant for publishing the alleged libelous

affidavit. Insofar as St. Amant is concerned, the case is exactly parallel with the New York Times decision. Surely St. Amant, having secured an affidavit to the facts set forth therein, can hardly be said to have been actuated by malice toward Thompson. Indeed no proof is. shown here that St. Amant knew that any fact stated in the affidavit was false or that any conclusion drawn from a true fact stated in the affidavit was false.

However the majority opinion, in holding St. Amant liable for damages, deduces. that the alleged defamatory remarks concerning Thompson were uttered by St. Amant with " * * * a reckless disregard as to whether the statements concerning Thompson were true or not". In reaching this conclusion the majority feels that St. Amant could not rely on the verity of the statements of fact contained in the affidavit; that it was incumbent on him to make an investigation of the truth of the statements before publication and that his failure to do so renders him liable as he necessarily utters the defamatory statement with reckless disregard of its truth or falsity. This pronouncement effectually implies malice for it places ignorance of falsity on a parity with knowledge of falsity and in the same category with actual malice by holding that failure to. make an independent investigation of truth constitutes a reckless disregard of truth or falsity. But this is exactly contrary to.

the view of the United States Supreme Court in the New York Times case.

Under the Times doctrine a qualified privilege extends to misstatements of facts in a publication relating to a public officer if other conditions of a qualified privilege (absence of actual malice) exists. There, it was held that a statement attacking the official conduct of a public officer does not forfeit the protection of the constitutional guaranty of free speech by the falsity of some of its factual statements and by the alleged defamation of the public official or by a combination of these two elements and that a defense must be allowed for erroneous statements honestly made. The court found that actual malice had not been shown on the part of the signers or sponsors of a newspaper advertisement describing the maltreatment in Alabama of negro students protesting segregation, where there was no evidence whatever that they were aware of any erroneous statements or were in any way reckless in that regard.[4] With respect to the newspaper, it was held that a statement by its secretary that he thought the advertisement was substantially correct afforded no constitutional warrant for inferring actual malice from his ignoring the falsity of the advertisement, where his opinion was at least a reasonable one, and actual malice on the part of the newspaper

was not shown by its failure to retract, upon plaintiff's demand, even though it later retracted upon the demand of the Governor of Alabama. It was found that there was no duty on the part of the newspaper to check the accuracy of the defamatory statement against the news stories in its own files which would have shown its falsity. This dereliction on the part of the newspaper was regarded as mere negligence and constitutionally insufficient to show the recklessness that is required for a finding of actual malice.

In the case at bar, the majority opinion places a much greater burden on St. Amant—for the Court implies actual malice, contrary to the New York Times case, by concluding that, because he testified that he gave no thought to Thompson, this " * * * was reckless error for him to take this position * * * a faulty assumption * * * in utter disregard of whether the remarks about Thompson were true or false."

In my view, St. Amant was justified in regarding the affidavit of Albin to be accurate. Further inquiry was not essential; the most that can be said is that, perhaps, he was negligent but negligence alone will not support a finding of actual malice.

The judgment of the Court of Appeal should be affirmed.

4. This holding clearly supports the view I have above stated with regard to the author of the affidavit.