*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0316p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

JAMES D. YOUNG,

  *Plaintiff-Appellee*,

  *v.*

GANNETT SATELLITE INFORMATION
NETWORK, INC.,

  *Defendant-Appellant*.

No. 12-3999

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:10-cv-00483—Michael R. Barrett, District Judge.

Argued: June 19, 2013

Decided and Filed:  October 31, 2013

Before:  SILER, MOORE, and ROGERS, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** John C. Greiner, GRAYDON, HEAD & RITCHEY LLP, Cincinnati, Ohio, for Appellant.  Stephen E. Imm, KATZ, GREENBERGER & NORTON, LLP, Cincinnati, Ohio, for Appellee.  **ON BRIEF:** John C. Greiner, GRAYDON, HEAD & RITCHEY LLP, Cincinnati, Ohio, for Appellant.  Stephen E. Imm, KATZ, GREENBERGER & NORTON, LLP, Cincinnati, Ohio, for Appellee.

  ROGERS, J., delivered the opinion of the court, in which SILER, J., joined. MOORE, J. (pp. 10–15), delivered a separate dissenting opinion.

─────────────────

## OPINION

─────────────────

  ROGERS, Circuit Judge.  In 1997, the Miami Township police department fired Police Sergeant James Young for allegedly forcing sex on a woman he was said to be involved with.  However, the termination was overturned by an arbitrator.  The arbitrator

stated that it was unclear what happened on the day in question but that the police department had not proven its allegations.  The arbitrator's report also mentioned that DNA samples from the scene did not match Young and found that the complainant lacked credibility.  Thirteen years later, a Gannett newspaper published the statement "Young had sex with a woman while on the job" in an article commenting on a local debate about the suspension of a different police officer.  Young sued Gannett for defamation and obtained a $100,000 verdict.  Gannett now appeals the judgment, arguing that Young did not meet the high threshold for establishing a defamation claim involving a public official.  There was sufficient evidence for a jury to decide that Gannett's editor knew that the accusation was probably false and that the editor published it regardless.  The district court therefore properly entered judgment on the jury's verdict.

In 2010, Gannett's *Milford-Miami Advertiser* published an article about a Milford, Ohio police officer named Russell Kenney.  According to the article, Kenney had sex with the city's mayor.  Although the police chief recommended termination, Kenney received only a fifteen-day suspension.  The article suggested that the city chose suspension over termination so that it would not have to go through the arbitration process.

*Advertiser* editor Theresa Herron decided that the article needed context explaining why the city wanted to avoid arbitration.  She remembered that, twelve years earlier, neighboring Miami Township had fired Young for allegedly having sex while on duty but an arbitrator overturned the termination.  She conducted some research on Young's case, examining the records of the police investigation, the arbitrator's report, and a state court opinion upholding the arbitrator's decision.  She then added these two paragraphs to the article:

> In 1997, the Miami Township trustees terminated Sgt. James Young for a variety of charges including conduct unbecoming of a police officer, sexual harassment, immoral behavior, neglect of duty and gross misconduct.  Young had sex with a woman while on the job.

>Young sued saying the trustees violated the collective bargaining contract between the township and the police union. An arbitrator agreed with Young, but the township fought the decision. Clermont County Court of Common Pleas Judge Robert Ringland ruled: "While this court is not indicating it agrees with the arbitrator or condones the conduct which has occurred," based on other similar cases he could not set aside the arbitrator's decision. Young is a current employee with the Miami Township Police Department.

Young's story was more complex than the article suggested. Young and the woman at issue, Marcey Phillips, had apparently been seeing each other since Phillips's relationship with one of Young's coworkers ended. Young admitted during the police department investigation that he had placed his hands on Phillips's body, had hugged her and had kissed her. He had also made jokes in the presence of fellow police employees about alleged or desired sexual behavior with Phillips and had called Phillips from work. However, Young denied that he ever engaged in sexual conduct with Phillips. On February 9, 1997, the relationship went sour. It remains unclear what happened on that day, but Phillips later accused Young of forcing her to perform oral sex on him. The police department investigated. During the investigation, the police recovered a human semen sample from the rug where Phillips alleged the sexual act occurred. Based on the investigation, the police department recommended terminating Young. The local laboratory later determined that the semen did not match Young's DNA.

Young's union filed a grievance and, under the collective bargaining agreement, an arbitrator took up the matter. The arbitrator found that both Young and Phillips lacked credibility. The arbitrator noted that Phillips had a "well documented history of histrionic . . . behavior that seriously undermined her credibility," lied about being engaged to two men, lied about being diagnosed with cancer, and lied about being pursued or abused by other men. Turning to the events of February 9, 1997, the arbitrator found that Phillips's accusation of forced oral sex was not supported by the evidence. He noted that it was a "classic 'he said, she said' scenario" and that the "lack of truthfulness by both parties . . . prevents any reasonable assessment of what happened."

The arbitrator concluded that "the evidence and testimony create doubts as to whether the relationship went beyond what could be described as a private relationship between two consenting adults" and that the township "failed to establish a nexus between the personal conduct of [Young with Phillips] and his job." The arbitrator therefore ordered that Young be reinstated. However, the arbitrator also found that the township had proven that Young had violated its rules by making inappropriate sexual remarks regarding Phillips at work, by failing to leave Phillips's residence immediately upon receiving a call, and by failing to follow orders not to discuss the investigation with others. The arbitrator ordered that Young's termination be converted to a sixty-day suspension and that Young be required to attend a sexual-harassment training session.

The township appealed the arbitrator's decision. The Clermont County Court of Common Pleas affirmed, noting that it was "constrained by the standards of review permitted in upholding this arbitration decision" and, accordingly, did not engage in its own independent fact-finding.

Thirteen years after the alleged incident occurred, Young saw the *Advertiser* article and sued Gannett for defamation. The district court denied Gannett's motion for summary judgment. The case was presented to a jury, and the jury was instructed that to find for Young, they must "find by clear and convincing evidence . . . that . . . [Gannett] acted with actual malice." The court explained to the jury that actual malice "occurs when the defendant makes a false statement either with the knowledge that it was false or with reckless disregard of whether or not it was false." Furthermore, the court instructed the jury that "[i]n the case of an ambiguous document, the adoption of a rational interpretation, though arguably reflecting a misconception, does not constitute actual malice." The jury found Gannett liable, awarding Young $100,000 in compensatory damages. Gannett moved for judgment as a matter of law, but the district court denied that motion as well.

Gannett now appeals, raising two arguments. First, Gannett argues that Young failed to establish actual malice because the statement at issue was based on a rational

interpretation of an ambiguous document. Second, Gannett argues that the Young failed to prove harm to his reputation. Neither argument has merit.

The *Advertiser*'s editor, Herron, reviewed the arbitrator's report. She therefore knew that there was no evidence that Young had forced sex on Phillips and that it was unclear whether they had ever had sex at all. In the definitive Supreme Court case regarding the sufficiency of a jury verdict finding actual malice in the press coverage of a public figure, the Supreme Court explained the standard to be applied by the jury:

> If a false and defamatory statement is published with knowledge of falsity or a reckless disregard for the truth, the public figure may prevail. A "reckless disregard" for the truth, however, requires more than a departure from reasonably prudent conduct. "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." The standard is a subjective one—there must be sufficient evidence to permit the conclusion that the defendant actually had a "high degree of awareness of . . . probable falsity." . . . In a case such as this involving the reporting of a third party's allegations, "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."

*Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989) (citations omitted). There was sufficient evidence for the jury to conclude that Herron was well aware that the statement she added to the article was probably false. She nonetheless added the statement to provide context for the story about Officer Kenney. The jury could find reckless disregard of the truth and clear and convincing proof of actual malice.

The jury could have properly relied upon the inclusion in the arbitrator's report of several statements that Herron should have seen as red flags. First, the report noted that the semen found on Phillips's carpet did not match Young's DNA. Second, the report cast serious doubts on Phillips's credibility. Third, it mentioned only a single incident that occurred while Young was on duty. As to that incident, the arbitrator noted that Phillips's accusation that Young forced her to perform oral sex "is not supported by the evidence" and that "[t]he lack of truthfulness by both parties . . . prevents any

reasonable assessment of what happened." Finally, the arbitrator concluded that, even if Young and Phillips did have a sexual relationship, the police department "failed to establish a nexus between the personal conduct [of Young involving Phillips] and his job."

Armed with that knowledge, Herron nevertheless published the statement "Young had sex with a woman while on the job" as if it were fact. This is reckless disregard of the truth at best, and is sufficient for the jury to have found that Gannett published the statement with actual malice. A newspaper cannot publish an accusation that it knows has no evidence behind it as a fact to fit its desired storyline and then cloak itself in the First Amendment.[1]

Herron was also reckless in failing to conduct any investigation beyond the records of the original case. She did not seek out Young for comment, nor did she talk to anyone involved in his case, even though the arbitrator's report provided obvious reasons to doubt the veracity of Phillips's complaints and the police investigation. When Herron found no definitive statement in the arbitrator's report that Young had sex with Phillips at any time, she should have investigated further. As the Supreme Court explained in *Harte-Hanks*, "[a]lthough failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category." 491 U.S. at 692 (citation omitted). Gannett argues that the arbitrator's statement that "the truth is somewhere in the middle" is such a definitive statement. However, while a "middle ground" between rape and no sex could imply various degrees of intimate contact, it does not logically imply sex while on duty, or at least the jury could so find. Since the administrator's report does not say anything about Young's having sex while on duty, this is a situation much like that in *Harte-Hanks*, where "it is likely that the

---

[1]The Supreme Court has explained that "a newspaper's motive in publishing a story . . . cannot provide a sufficient basis for finding actual malice." *Harte-Hanks*, 491 U.S. at 665. We do not rely on Gannett's desire to make Young's story fit Kenney's to find actual malice. It is, however, "circumstantial evidence which, when combined with other evidence, may amount to malice." *See Perk v. Reader's Digest Ass'n, Inc.*, 931 F.2d 408, 411 (6th Cir. 1991). Furthermore, it provides context to the otherwise inexplicable decision to rewrite the story of an event long forgotten.

newspaper's inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probably falsity of [the] charges." *Id.*

The jury reviewed the same reports that Herron did, and determined that the statement "Young had sex with a woman while on the job" was false. The jury was also instructed that "the adoption of a rational interpretation [of an ambiguous document], though arguably reflecting a misconception, does not constitute actual malice." Since the jury found that Gannett exhibited actual malice, it must also have concluded either that the arbitrator's report was not an ambiguous document or that Herron's interpretation was not rational.

These conclusions of basic fact are subject to some deference in the context of this particular case, notwithstanding that the First Amendment requires that we conduct an independent review to "decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'" *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 510–11 (1984). As the Supreme Court cautioned in *Harte-Hanks*, "only through the course of case-by-case adjudication can we give content to these otherwise elusive constitutional standards." 491 U.S. at 686. The Supreme Court in *Harte-Hanks* upheld a jury finding of actual malice even though the case involved a story about the qualifications of a candidate in an election. The Supreme Court acknowledged that such a situation presents "probably the strongest possible case for application of the *New York Times* rule, and the strongest possible case for independent review." *Id.* at 686–87 (internal quotation marks and citation omitted). In contrast, this case, while still requiring independent review to ensure that the actual malice standard has been met, presents a stronger case for deferring to the jury's findings. This was a personnel matter involving the alleged actions of one officer in a non-leadership position over a decade in the past. Young did not enter the political arena, and knowledge of what someone alleged he had done thirteen years before the story was not necessary for members of the electorate to exercise their constitutional rights. Thus, while we must make an independent determination regarding whether there is sufficient evidence of the

existence of actual malice, we can properly defer to the jury on historical facts, credibility determinations, and elements of statutory liability.  *See United States v. Hanna*, 293 F.3d 1080, 1088 (9th Cir. 2002).  Indeed, the Supreme Court relied on such jury-found facts in reaching its decision in *Harte-Hanks*.  *See* 491 U.S. at 690–91.

Moreover, had Young not conceded the issue it would not even be clear that actual malice is the proper standard to apply in this case.  Gannett cites the Ohio Supreme Court case of *Soke v. Plain Dealer*, 632 N.E.2d 1282, 1283 (Ohio 1994), which held that police officers are public officials for defamation purposes.  However, *Soke* may have misinterpreted federal law on the issue.  *Soke* noted that the "United States Supreme Court has repeatedly recognized that police officers are public officials," and cited *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), *Henry v. Collins*, 380 U.S. 356 (1965), *St. Amant v. Thompson*, 390 U.S. 727 (1968), and *Time, Inc. v. Pape*, 401 U.S. 279 (1971), as authority.  However, none of those cases involved officers in Young's position. *New York Times Co. v. Sullivan* involved a city police commissioner, an elected position.  376 U.S. at 256.  *Henry v. Collins* involved the chief of police. 380 U.S. at 356.  In *St. Amant*, the Court "accept[ed] the determinations of the Louisiana courts . . . that Thompson was a public official."  390 U.S. at 730.  The Louisiana Supreme Court had concluded that Thompson was a public official because he had "substantial responsibility for or control over the conduct of governmental affairs." *Id.* at 730 n.2 (quoting *Thompson v. St. Amant*, 196 So.2d 255, 261 (La. 1967)).  Finally, *Pape* involved the Chicago Deputy Chief of Detectives.  401 U.S. at 280–81.  All of these police officers had key public leadership positions.  Young did not.  Of course, because Young does not argue that a different standard should apply in this case, we apply the actual malice standard,  without deciding whether it is necessarily the proper standard to apply to a rank-and-file police officer.

The evidence in this case is sufficient to cross the constitutional threshold.  The arbitrator's report did not even consider whether Young had sex with Phillips while on duty.  The report only mentioned one instance where Young was at Phillips's house while on duty.  Semen found on Phillips's rug on that day did not match Young's DNA.

The arbitrator also found that Phillips's story about what happened on that date was not credible. The jury could find that Herron's interpretation of the arbitrator's report to say that Young and Phllips had sex that day was irrational.

Gannett argues in the alternative that Young failed to prove that he suffered any harm to his reputation and that, therefore, he failed to prove defamation. The publisher bases this argument on the unsupported statement that "[h]arm to reputation is an element of the tort."

Gannett misstates Ohio law. The injury element to a defamation claim in Ohio only requires "that the plaintiff suffered injury as a proximate result of the publication." *Am. Chem. Soc'y v. Leadscope, Inc.*, 978 N.E.2d 832, 852 (Ohio 2012). Harm to a person's reputation is just one possible injury; it is not a required element of the tort. Pain, suffering, anguish, humiliation, and embarrassment are personal harms that do not necessarily require others to change their views of the plaintiff, but are sufficient to meet the injury element of a defamation action. *See Gilbert v. WNIR 100 FM*, 756 N.E.2d 1263, 1277 (Ohio Ct. App. 2001). Although Young may not have shown harm to his reputation, he presented evidence of emotional harm. This evidence included testimony from Young's wife that he became upset and withdrawn and that he had trouble sleeping. It also included testimony from Young and at least one fellow officer about Young's emotional state after reading the article. The jury accepted these damages and valued them at $100,000. Gannett provides no valid basis for challenging the jury's conclusion on this point.

There was sufficient evidence in this case for the jury to conclude that Gannett's employees knew that the statement "Young had sex with a woman while on the job" was probably false, but nonetheless failed to research further and published it. The jury could accordingly find actual malice. The district court's judgment is therefore affirmed.

———————

**DISSENT**

———————

KAREN NELSON MOORE, Circuit Judge, dissenting.  An arbitrator determined that on February 9, 1997, Police Sergeant James Young visited Marcey Phillips, a woman with whom he was having a consensual adult relationship, while on duty as a police officer.  In his report, the arbitrator explored what might have occurred during that visit, but could not reach a conclusive determination given the total lack of credibility of both Young and Phillips.  Thirteen years after this alleged incident, Theresa Herron relied on the details in the arbitrator's report when she edited a story in the *Milford-Miami Advertiser* and inserted two paragraphs that included the sentence "Young had sex with a woman while on the job."  Because I believe that Herron's statement reflects a rational interpretation of the contents of the arbitrator's report, an ambiguous document, and that upon de novo review there was insufficient evidence in the record to support a conclusion otherwise, I would hold that Herron did not act with actual malice as a matter of law.  I therefore respectfully dissent.

As an initial matter, I disagree with the standard of review set forth by the majority.  When a jury reaches a verdict in favor of a plaintiff on a defamation claim, we "have a constitutional duty to exercise independent judgment and determine whether the record establishes actual malice with convincing clarity."  *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 659 (1989).  The Supreme Court has explained that use of the de novo standard is based "on the unique character of the interest protected by the actual malice standard."  *Id.* at 685–86.  "Our profound national commitment to the free exchange of ideas, as enshrined in the First Amendment, demands that the law of libel carve out an area of breathing space so that protected speech is not discouraged."  *Id.* at 686 (internal quotation marks omitted).  I therefore cannot agree with the majority's decision to hedge this de novo review by making the unsupported contention that this type of case requires greater deference to the jury's findings than the type examined in

*Harte-Hanks*. Maj. Op. at 8. The Supreme Court has imposed no such limitations, nor can any be inferred from its unmitigated defense of independent review.

Because "[t]his value must be protected with special vigilance," the Supreme Court demands much of a plaintiff who seeks to show actual malice. *Harte-Hanks*, 491 U.S. at 687. The Court has explained that "[a]ctual malice . . . requires at a minimum that the statements were made with a reckless disregard for the truth. And although the concept of reckless disregard cannot be fully encompassed in one infallible definition, we have made clear that the defendant must have made the false publication with a high degree of awareness of probable falsity, or must have entertained serious doubts as to the truth of his publication." *Id.* at 667 (internal citations, quotation marks, and alteration omitted). In other words, this is a subjective standard. For example, "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard." *Id.* at 688.

The district court chose to instruct the jury on the issue of actual malice based in part on language in *Time, Inc. v. Pape*, 401 U.S. 279 (1971). Specifically, the district court instructed the jury that "the adoption of a rational interpretation [of an ambiguous document], though arguably reflecting a misconception, does not constitute actual malice." The *Pape* Court discussed this issue as follows: "Time's omission of the word 'alleged' amounted to the adoption of one of a number of possible rational interpretations of a document that bristled with ambiguities. The deliberate choice of such an interpretation, though arguably reflecting a misconception, was not enough to create a jury issue of 'malice' under *New York Times*." 401 U.S. at 290. The issue we must resolve, then, is whether Herron's assertion that "Young had sex with a woman while on the job" was a rational interpretation of an ambiguous document.

The document at issue, the arbitrator's report, is undoubtedly ambiguous as to the question of whether "Young had sex with a woman while on the job," as the arbitrator was not responsible for, and therefore did not make, an express determination on that issue. Rather, the arbitrator was tasked with determining whether Young engaged in "sexual harassment that rise[s] to the level of rape" and "Neglect of Duty,"

among other things. R. 52-4 (Arbitrator Report at 11, 20) (Page ID #2152, 2161). Because there is no direct resolution of whether Young had sex with Phillips that night while he was on duty, the document is ambiguous.

Nonetheless, the arbitrator did make certain findings that can inform our analysis on the rational-interpretation issue. With respect to the rape charge, for example, the arbitrator concluded that because both Phillips and Young were not credible, the Employer has failed "to prove beyond a reasonable doubt that Mr. Young engaged in sexual behavior that was uninvited and unwanted by Ms. Phillips." *Id.* at 18 (Page ID #2159); *see also id.* at 16 (Page ID #2157) ("The lack of truthfulness by both parties in this matter prevents any reasonable assessment of what happened on February 9th."). In reaching this conclusion, the arbitrator noted that "the evidence and testimony create doubts as to whether the relationship went beyond what could be described as a private relationship between two consenting adults." *Id.* at 18–19 (Page ID #2159–60). In other parts of his report, the arbitrator asserted that he "do[es] not doubt that [Phillips's son] saw physical touching between his mother and Mr. Young" and again that "[t]he evidence and testimony more plausibly support a consenting relationship between Mr. Young and Ms. Phillips." *Id.* at 15, 17 (Page ID #2156, 2158) I believe that a rational inference gleaned from these statements is that Phillips and Young had a relationship that was sexual in nature during the time period in issue.

Importantly, the arbitrator also determined that Young was in neglect of duty on the night in question. In fact, he concluded that Young was in neglect of duty because he was at Phillips's residence: "[o]n February 9, 1997 he did not leave the residence of Marcey Phillips immediately upon receiving a call." *Id.* at 20 (Page ID #2161). The arbitrator also noted that this was not the first time that Young had been at Phillips's apartment; he had "stopped by Ms. Phillips' apartment on 6 or 7 occasions between January 12, 1997 and February 9, 1997." *Id.* at 4 (Page ID #2145). The arbitrator went into considerable detail as well regarding the evolution of their relationship, explaining that this relationship seemingly began after Phillips had ended a relationship with

another man, and "was seeking solace and possibly more." *Id.* at 15 (Page ID #2156). According to the report, "Mr. Young offered that solace and possibly more." *Id.*

The totality of the statements made in this report lend support for Herron's assertion that "Young had sex with a woman while on the job." It is easy to infer from the report that Young and Phillips were engaged in a weeks-long relationship of a sexual nature and it was expressly found that Young had been at Phillips's house while on duty during that time period. Although it cannot be said for certain that they did have sex while he was on duty, it is not irrational to reach that conclusion based on the statements made in the arbitrator's report. In other words, I believe that Herron's statement "amounted to the adoption of one of a number of possible rational interpretations of a document that bristled with ambiguities." *Pape*, 401 U.S. at 290. "The deliberate choice of such an interpretation, though arguably reflecting a misconception, was not enough" to support a finding of actual malice. *Id.* Although Herron's statement certainly did not reflect a careful parsing of the nuances present in this messy case, it was not an irrational interpretation of the arbitrator's report.

The majority asserts that "while we must make an independent determination regarding whether there is sufficient evidence of the existence of actual malice, we can properly defer to the jury on historical facts, credibility determinations, and elements of statutory liability." Maj. Op. at 7–8. It fails to make such an independent determination. Rather, the majority relies on the jury potentially finding that Herron's interpretation of the arbitrator's report was irrational, *id.* at 9, but *Harte-Hanks* cautions against precisely this type of reliance. *Harte-Hanks* unequivocally holds that the court must "make an independent *de novo* review of the entire record." *Harte-Hanks*, 491 U.S. at 664. The majority's deference to the jury regarding whether Herron's interpretation of the report was rational "incorrectly relied on subsidiary facts implicitly established by the jury's verdict instead of drawing its own inferences from the evidence." *Id.* I therefore cannot agree with either the majority's reliance on the jury's finding or with the majority's conclusion.

Furthermore, without providing any legal support for its position, the majority opinion argues that it is "not . . . clear that actual malice is the proper standard to apply in this case." Maj. Op. at 8. The majority acknowledges that the Ohio Supreme Court in *Soke v. The Plain Dealer*, 632 N.E.2d 1282, 1283 (Ohio 1994), has "held that police officers are public officials for defamation purposes." Maj. Op. at 8. Despite the highest court of the state clearly holding that police officers are public officials for purposes of state defamation law, the majority questions whether such should be the case. The only justification advanced for questioning whether a rank-and-file police officer such as Sergeant Young is a public official for defamation purposes is that the Ohio Supreme Court "may have misinterpreted federal law on the issue," *id.,* in finding a detective, "being a police officer, is a public official," *Soke*, 632 N.E.2d at 1284.

The Ohio Supreme Court, however, is not alone in its interpretation of federal precedent. The First Circuit has confirmed that a police officer serving as a resource officer at a middle school is a public official under Massachusetts law. *Dixon v. Int'l Bhd. of Police Officers*, 504 F.3d 73, 88 (1st Cir. 2007). The Third Circuit held that a rookie patrol officer is a public official. *Coughlin v. Westinghouse Broad. & Cable Inc.*, 780 F.2d 340, 342 (3d Cir. 1986). The Fifth Circuit concluded that a patrol officer is a public official. *McKinley v. Baden*, 777 F.2d 1017, 1021 (5th Cir. 1985). The Seventh Circuit held that federal law-enforcement agents are public officials. *Meiners v. Moriarity*, 563 F.2d 343, 352 (7th Cir. 1977). The Eighth Circuit acknowledged that a police officer patrolling a demonstration was a public official for defamation purposes. *Speer v. Ottaway Newspapers*, 828 F.2d 475, 476 (8th Cir. 1987). The Ninth Circuit found that a city police officer was a public official requiring proof of actual malice in a defamation case. *Rattray v. City of Nat'l City*, 36 F.3d 1480, 1486 (9th Cir. 1994). Finally, in a widely cited opinion, the Tenth Circuit held that the chief investigator for the county attorney was a public figure in pressing his defamation claim regarding his alleged acts when he was a "normal street patrolman." *Gray v. Udevitz*, 656 F.2d 588, 591 (10th Cir. 1981). I have been unable to find a circuit court holding to the contrary.

The overwhelming and entirely one-sided decisions by our sister circuits leave no doubt that police officers are public officials for defamation purposes. Courts have uniformly applied the actual malice standard to police officers because there is a strong societal interest in protecting expression that criticizes law enforcement officers. *Meiners*, 563 F.2d at 352 ("The public is certainly interested in an important and special way in the qualifications and performance of federal agents . . . whose decisions to search and to arrest directly and personally affect individual freedoms."). As a polity, we grant police officers extraordinary power: to arrest suspects curtailing citizens' liberty, to search private areas invading individual privacy, and, when the circumstances require it, even to use deadly force. In light of this extraordinary power, criticism of police officers in the performance, or lack thereof, of their duties, ought receive the full protection of the First Amendment whether those officers are the chiefs of police, captains, detectives, or rank-and-file officers walking a beat. *Gray*, 656 F.2d at 591 ("The cop on the beat . . . . possesses both the authority and the ability to exercise force. Misuse of his authority can result in significant deprivation of constitutional rights and personal freedoms . . . . The strong public interest in ensuring open discussion and criticism of his qualifications and job performance warrant[s] the conclusion that he is a public official.").

Given the clear holding of the highest court of Ohio that police officers are public figures under its defamation law, confirmed by the uniform conclusions of our sister circuits and supported by strong policy rationales, I am left with no doubt that Sergeant Young's defamation claim, even though he is a rank-and-file police officer, is subject to the actual malice standard.

For these reasons, I respectfully dissent.