July 8, 2021

**Supreme Court**

No. 2018-169-Appeal.
(PC 14-2837)

Russell Henry                    :

v.                    :

Media General Operations, Inc., et al.   :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Russell Henry                    :

v.                               :

Media General Operations, Inc., et al.   :

Present:  Suttell, C.J., Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Robinson, for the Court.**  We are called upon in this case to assess

the application of the First Amendment to the United States Constitution, and the

pertinent United States Supreme Court precedent interpreting same, to an allegedly

defamatory report which was broadcast on the evening news.  In so doing, we keep

in mind the following highly insightful and germane words of Judge Learned Hand,

which were quoted approvingly by the United States Supreme Court in a crucially

important First Amendment opinion:

> "[The First Amendment] presupposes that right
> conclusions are more likely to be gathered out of a
> multitude of tongues, than through any kind of
> authoritative selection. To many this is, and always will
> be, folly; but we have staked upon it our all." *New York
> Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (quoting
> *United States v. Associated Press*, 52 F. Supp. 362, 372
> (S.D.N.Y. 1943)).

- 1 -

The plaintiff in the instant case, Captain Russell Henry,[1] appeals from the April 11, 2018 entry of final judgment in Providence County Superior Court in favor of defendants, Media General Operations, Inc. (Media General), Chris Lanni,[2] James Taricani, Officer Peter Leclerc,[3] Ronald Jacob,[4] and Captain Karen E. Guilbeault. Final judgment was entered in the case after defendants' motions for summary judgment were granted. On appeal, Captain Henry contends that the hearing justice erred in holding that a police officer is what he characterizes as a "per se public official * * *." He further posits that the hearing justice erred in determining that defendants' publication of a purportedly false allegation was not the product of actual malice; he adds that, as to that issue, there are genuine issues of material fact

---

[1] According to his brief before this Court, at all times pertinent to the action before the Superior Court, Russell Henry was a lieutenant in the Cranston Police Department. However, his brief further indicates that, as of the time of the filing thereof, he had attained the rank of captain. Therefore, for the purposes of this opinion, we shall refer to him as Captain Henry.

[2] Mr. Lanni is referred to both in the Second Amended Complaint and in the case caption as Chris Lanni. However, he is referred to in the hearing justice's April 4, 2018 decision on defendants' motions for summary judgment and in his brief before this Court as Christopher Lanni. We shall hereinafter refer to him simply as Mr. Lanni.

[3] In the hearing justice's written decision, he notes the fact that Officer Leclerc's last name appears variously as "Leclerc" and "LeClerc" throughout the depositions. In addition, he is referred to in his brief as Peter Leclerc and Peter-John Leclerc. We shall refer to him simply as Officer Leclerc.

[4] On appeal, Ronald Jacob failed to file a prebriefing counter-statement pursuant to Article I, Rule 12A of the Supreme Court Rules of Appellate Procedure. For that reason, Mr. Jacob was defaulted.

remaining which make summary judgment inappropriate and that the hearing justice "impermissibly weighed inferences" against Captain Henry. Captain Henry further avers that the "trial justice erred in granting summary judgment on [his] claims of negligent and intentional infliction of distress and violation of R.I. Gen. L. sec. 9-1-28.1 (false light)."

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

On June 4, 2014, Captain Henry commenced the instant action by filing a complaint in Superior Court. Eventually, a second amended complaint was filed on September 8, 2016 (the complaint). The complaint alleged that NBC 10 WJAR (WJAR), which was owned and operated by Media General, "published reports that they referred to as the 'Cranston Parking Ticket Scandal' which alleged that patrol officers had issued a substantial increase in parking tickets in the districts represented by two City of Cranston City Council members that had voted against a police union [contract] proposal." The complaint also averred that a news report on WJAR had stated that the tickets were issued in retribution for the votes of the city

council members.  According to the complaint, Mr. Taricani,[5] an investigative reporter for WJAR, specifically reported during the January 10, 2014 six o'clock evening news the following, which the complaint alleges was false and defamatory[6] as to Captain Henry:

> "'Two sources familiar with the ticket scandal investigation told the I-Team that Captain Stephen Antonucci, the Police Union President,[7] used his private cell phone and told another Lieutenant to use his private cell phone to order officers to issue overnight parking tickets to punish two City Councilmen who voted against the police union contract proposal. The use of the personal cell phones was to help them cover their tracks. Antonucci allegedly told his cousin, Lt. Russell Henry, to use his personal cell phone to give the order to issue the tickets. Mayor Allan Fung has recently decided to rescind any tickets that were apparently issued as retribution for the contract vote.'"

---

[5] The Court notes that, since the commencement of this case, Mr. Taricani has passed away.  *See* Tom Mooney, *Veteran R.I. TV newsman Jim Taricani dies at 69*, The Providence Journal (June 22, 2019), https://www.providencejournal.com/news/20190622/veteran-ri-tv-newsman-jim-taricani-dies-at-69 (last visited July 7, 2021).

[6] As stated in the decision of the hearing justice, defendants' counsel conceded at oral argument before the Superior Court that, solely for the purposes of the motions for summary judgment, the statements at issue were defamatory. Accordingly, we will similarly assume, without deciding, that the statements at issue were defamatory.

[7] Captain Stephen Antonucci was ultimately fired from the Cranston police force as a result of his involvement in the parking ticket scandal.  Colonel Marco Palombo, Chief of the Cranston Police Department, also retired in the wake of the scandal.

Further, according to the complaint, a "graphic" was also published, which stated that "'Lt. Russell Henry * * * ordered officers to issue tickets' in the context of the 'Cranston Parking Ticket Scandal.'"[8] In addition, according to the complaint, a report that was consistent with what was reported on the January 10, 2014 evening news was published on WJAR's website. The complaint went on to allege that, contrary to the news report, Captain Henry "had no involvement either directly or indirectly, in the 'Cranston Parking Ticket Scandal'" and, further, that he "was cleared of any involvement * * * by [a] Rhode Island State Police investigation."

The complaint stated that Mr. Lanni was the News Director of WJAR. The complaint further stated that Officer Leclerc was a Cranston police officer and that Mr. Jacob was a retired Cranston police officer. It posited that Officer Leclerc and Mr. Jacob were the sources on which Media General, Mr. Lanni, and Mr. Taricani relied in preparing the news report at issue. Additionally, according to the complaint, Captain Guilbeault was a Cranston police officer "who published false and defamatory information about the Plaintiff to Defendant, Ronald Jacob, who then told Defendant, James Taricani * * *."

The complaint went on to set forth the following counts: one count of libel (Count One); one count of slander (Count Two); one count of "[v]iolation of R.I.

---

[8] Mr. Taricani testified during his deposition that the "graphic" showed a "parking ticket that appears to be under a windshield wiper" as well as a cellular phone.

Gen. Laws §9-1-28.1(a)(4)" due to the fact that defendants "caused the Plaintiff to be placed before the public in a false position" (Count Three); and one count of negligent and intentional infliction of emotional distress (Count Four).

In order to provide the pertinent facts, we now turn to the depositions of the parties, the answers to interrogatories, and other documents in the record.

**A**

**The Deposition Testimony of James Taricani**

Mr. Taricani testified at his deposition that the first time he became aware of the Cranston parking ticket scandal was in late November or early December of 2013, when he "received either an anonymous letter in the mail or * * * an e-mail from someone who made it apparent that they were a Cranston police officer." It was his testimony that he knew the identity of the informant, but he refused to reveal it at his deposition, invoking his "rights as a reporter under the Rhode Island Shield Law."[9] It was his testimony that, in addition to the just-mentioned unnamed source, Mr. Jacob was his other source for the story at issue. He stated that Mr. Jacob was "willing to come forward." However, he added that the other source was not willing to do so at that time.

---

[9] It would eventually become clear, in the course of the development of this case, that the unnamed source whom Mr. Taricani referenced at his deposition was Officer Leclerc.

- 6 -

It was Mr. Taricani's further testimony that, prior to the broadcast of the story at issue, he had composed an initial story about the Cranston parking ticket scandal (which story did not implicate Captain Henry). He added that, in preparing for that initial story, he had requested all of the parking ticket records from "Cranston City Hall * * *." Mr. Taricani elaborated that the unnamed source had provided him a "breakdown of the tickets that were issued prior to the night in question and then after to show the difference;" he added that his source suggested that Mr. Taricani obtain the records from City Hall. He testified that the summary of tickets which he received from his source "matched" the actual records that he received from City Hall.[10] It was further Mr. Taricani's testimony that Mr. Jacob contacted him after that initial story aired.

Mr. Taricani specifically stated in his deposition that, at the time of the broadcast of the second story (*i.e.*, the story at issue in this case), he "certainly believed it was true * * * [b]ased on [his] sources * * *." Media General's answers to Captain Henry's first set of interrogatories stated that Officer Leclerc told Mr. Taricani that Captain Antonucci ordered Captain Henry (who at that time was a

---

[10] Media General's answers to Captain Henry's first set of interrogatories stated that Mr. Taricani "recall[ed] that each piece of information provided by Mr. Leclerc was ultimately determined to be accurate." Media General added that, for that reason, Mr. Taricani concluded that Officer Leclerc was a "truthful and reliable source of information pertaining to matters involving the Cranston Police Department."

lieutenant) to "use his private cell phone to instruct patrol officers to issue" the tickets in question. Mr. Taricani further testified at his deposition that the unnamed source—*i.e.*, Officer Leclerc—"claimed to be speaking with people within the Cranston Police Department that were involved in the internal investigation," but he added that said source did not identify who those individuals were. Mr. Taricani agreed during his testimony that the unnamed source did not actually witness anything that Captain Henry did. He explained that, "because the source had given [him] information about other stories that was accurate, in particular Captain Antonucci's involvement in [the Cranston parking ticket scandal], [he] thought [the source] had credibility."

With respect to Mr. Jacob, Mr. Taricani testified that he was a retired Cranston police officer who had encountered some "difficulties" in obtaining a disability pension and that he had had "his issues with the Cranston Police Department * * * for a number of years." Mr. Taricani agreed that he could characterize Mr. Jacob as a "disgruntled former employee[.]" It was further Mr. Taricani's testimony that, in order to determine whether he was receiving true and accurate information from Mr. Jacob, he asked the unnamed source what he thought of Mr. Jacob (and he added that he might also have asked another police officer in the Cranston Police Department the same question); he stated that the feedback he received was that Mr. Jacob was a "good cop." Mr. Taricani said that he believed Mr. Jacob was credible

because Mr. Jacob "kept saying that he * * * was talking to people almost on a daily basis inside the Cranston Police Department that had direct knowledge of the internal investigation." Mr. Taricani further testified that he did not ask Mr. Jacob who his sources were because, in his mind, Captain Henry "was not a big part of the story" and had not done "anything wrong other than follow an order of Steve Antonucci." When Mr. Taricani was asked if, when Mr. Jacob did not reveal his sources, he made a further inquiry of Mr. Jacob about the matter, Mr. Taricani testified that he did not do so because he was "relying on [his] first source who had a track record of being credible * * *."

Mr. Taricani further testified that he learned from one or both of his sources that Captain Henry and Captain Antonucci had a "familial connection;" he added that he called someone else to verify that information and was told that the two men were cousins "or something like that." It was also Mr. Taricani's testimony that, in his opinion, Captain Henry was not "a big player in this story and I didn't think I was really defaming him or saying anything that would cause him grief or anything."

He also testified that he tried to confirm the story which mentioned Captain Henry by attempting to call "somebody at state police," and he said that he also had a conversation with City Councilman Steve Stycos.

When asked if he thought there was "anything more [he] could have done to determine" whether or not Captain Henry was actually involved, he stated: "Other

than talking to [Captain] Henry himself, I don't know what else I could have done." He testified that, prior to airing the story at issue, he had tried to contact Captain Henry but did not receive a response. Specifically, he testified that he called the Cranston Police Department and asked to be connected to Captain Henry's phone; however, he added that the individual with whom he spoke at the police department was unsuccessful in putting him through to Captain Henry's phone and that, therefore, he left a message on the phone of another police officer who he "assumed, wrongly, * * * would contact [Captain] Henry * * *." He further testified that he tried to find Captain Henry's home phone number but was unable to do so, although he stated that he did not remember "how extensive that inquiry was." When asked whether he would have done everything the same way if given the opportunity to do it over again, Mr. Taricani stated that he "perhaps would have made more of an effort to get ahold of [Captain] Henry that day."

Mr. Taricani went on to testify that, sometime after the airing of the story at issue, WJAR was contacted by Captain Henry's attorney, who requested that a correction be made on air. Mr. Taricani said that he then "double checked" with both of his sources and "pressed them," and they both ultimately said: "'Well, now we can't be 100 percent sure * * *.'" He elaborated that, prior to Captain Henry's attorney contacting the station, on the night the story at issue was broadcast, the "investigative reporter unit photographer" called Mr. Taricani at home after the story

had aired and informed him that Captain Henry was "upset" about the story and that Captain Henry said that he had "absolutely nothing to do with this ticket scandal." Mr. Taricani stated that, after that conversation, he called WJAR immediately and instructed the personnel there to take the story off the eleven o'clock news and the website, which, according to his testimony, they did. He stated that he did so because he "tried to be fair to [Captain] Henry and [he] didn't want that rebroadcast in any way, shape or form." He testified that the story was thereafter retracted.[11]

Of additional significance is the fact that, according to Captain Henry's first supplemental answer to Mr. Lanni's first set of interrogatories, Colonel Marco Palombo (who was the Chief of the Cranston Police Department during the time at issue) told Mr. Taricani on two occasions prior to the broadcast implicating Captain Henry that Captain Henry had no involvement in the parking ticket scandal.[12]

---

[11] It is also worth noting that, in Media General's answers to Captain Henry's first set of interrogatories, it was stated that Mr. Taricani spoke with Mr. Lanni within one or more days of the broadcast at issue and informed him of his two confidential sources; he told Mr. Lanni that his primary source was "very reliable," having previously provided him with information, of which Mr. Taricani was able to establish the accuracy. We further note that Mr. Lanni was deposed in this case, but the record before us contains only a very small portion of that deposition testimony.

[12] The hearing justice's decision on defendants' motions for summary judgment states that Media General, Mr. Taricani, and Mr. Lanni had conceded, solely for the purposes of their summary judgment motions, that Mr. Taricani spoke with Chief Palombo but that they otherwise deny such conversations occurred.

# B

## The Deposition Testimony of Officer Leclerc

Officer Leclerc testified that he was a patrol officer with the Cranston Police Department. He further testified that he was involved in the case because, in November or December of 2013, he was one of Mr. Taricani's sources for the story at issue. Officer Leclerc explained as follows just how he garnered the information that he provided to Mr. Taricani and why he did so:

> "I was in the locker room one morning getting dressed prior to work, and I heard a couple of guys on the other side of the locker room talking about something about tickets. Didn't pay much attention to it. I heard one of the guys mention something about getting a phone call from Russ. Didn't pay much attention to it. I went upstairs, started my day.
>     "About a month later or so, I heard it again outside of my office. Where my office is at the station, there's a lot of traffic that goes by. I heard it again. Once I heard it again, and feeling that I knew that [it was] Steve Antonucci who was involved in the [parking ticket scandal] and [Captain Antonucci and Captain Henry were] related, and the fact that they were on the executive board together, and the fact that they were -- stood to lose a lot of money [due to the police contract having failed to win approval from the City Council], I thought that it was true. And I believed for the better of the department it could not go internally due to the hostility and the potential corruption that was going on with the administration of that police department. There was only one way to go and to act was through the media."

Officer Leclerc testified that, when they met prior to the story at issue being aired, he told Mr. Taricani that he was a member of the Cranston Police Department.

He added that he did not give Mr. Taricani any documentation but simply told him where to look. He testified that, in an email, he specifically mentioned to Mr. Taricani that he had heard about Captain Henry's involvement in the parking ticket scandal. He further stated that he told Mr. Taricani that he had heard the information on "two separate occasions from separate groups in separate locations * * *."

Officer Leclerc testified that he did not know the identity of the individuals he heard discussing the parking ticket scandal in the locker room, but that they had to have been employees of the Cranston Police Department because they were in a restricted area; he added that he told Mr. Taricani that he did not know the identity of the individuals. He then testified that, with respect to the discussion he later overheard from inside his office, he also did not know the identity of the officers involved. It was his testimony that during neither conversation did he overhear statements as to what Captain Henry's specific involvement was.

Officer Leclerc stated at least twice during his deposition that he did not tell Mr. Taricani that Captain Henry ordered officers to issue tickets specifically by using his personal cell phone; but he then clarified, stating that he had in fact told Mr. Taricani that Captain Henry had "used a cell phone to call officers" despite Officer Leclerc's testimony that he had not learned the information about the cell phone from either of the overheard conversations which formed the basis of what he told Mr. Taricani.

When asked if he told Mr. Taricani that he was a source familiar with the parking ticket scandal investigation, Officer Leclerc testified that he "never used those words." Additionally, when asked if he did anything to independently verify the conversations he had overheard he stated: "Nothing." However, Officer Leclerc testified that, at the time, with the information that he had, he believed that the information he had relayed to Mr. Taricani was true.

## C

### The Deposition Testimony of Ronald Jacob

Mr. Jacob testified that he had retired from the Cranston Police Department and that, at the time of his deposition, he had been a resident of South Carolina for ten years. He testified that he had been receiving a pension since 2005 based on his years of service. He also mentioned that he would be going to court "soon" because he believed that he was entitled to, but was not receiving, a disability pension.

In an email sent on December 23, 2013, Mr. Jacob provided the following information to Mr. Taricani: "'My sources have stated that [Captain] Henry gave the order to the officers to ticket the vehicles. The problem I see with this is [Captain] Henry is an extended family member of Captain and Union President Stephen Antonucci.'" He sent a further email to Mr. Taricani on December 28, 2013, in which he stated: "Another rumor is that Stephen Antonucci and [Captain] Henry were riding around the two districts that were mass ticketed and used their cell

phones to contact the officer, who had those posts to ticket certain vehicles in those districts. As I stated before, [Captain] Henry is an extended family member of the Antonucci family. As I stated these are rumors, which need to be looked into."

It was Mr. Jacob's testimony at his deposition that he never "professed to have any firsthand knowledge of anything that was going on" in the department in 2013, nor did he tell Mr. Taricani that he did. Rather, it was his testimony that he spoke to Captain Guilbeault as well as at least three other individuals and that he could not say that Captain Guilbeault was the source of the information about Captain Henry; he added that he could say that Captain Guilbeault was the source of his information only "to about 33 percent" because he was "talking to other people" as well. It was Mr. Jacob's testimony that Captain Guilbeault was the only active-duty Cranston police officer to whom he spoke.

Mr. Jacob testified that he was not "trying to hurt anybody." He added that Mr. Taricani should have "look[ed] into" the information he had provided and that Mr. Taricani "dropped the ball" and "put it out too early." Mr. Jacob testified that he did not consider himself a source for Mr. Taricani, but rather was just "someone who was passing on rumors." He did acknowledge, however, that he did not "really care for" Captain Henry.

In addition, it is worth noting that, on February 5, 2014 (*i.e.*, after the broadcast at issue), Mr. Taricani emailed Mr. Jacob telling him that the other source

could no longer be "'sure'" if Captain Henry was involved. That email continued as follows: "When I first talked with you, you told me 'a Lt.' helped make the phone calls and the Lt. was related to Antonucci. My other source gave me Henry's name." In a November 8, 2015 email to one of the attorneys who represented the media defendants—*i.e.*, Media General, Mr. Lanni, and Mr. Taricani—Mr. Jacob stated that it was Mr. Taricani who gave him Captain Henry's name rather than the other way around.[13]

## D

## The Deposition Testimony of Captain Guilbeault

Captain Guilbeault specifically testified that she was not Mr. Jacob's source about events relative to the Cranston Police Department that occurred between November of 2013 and January of 2014. She further testified that she never spoke to Officer Leclerc about the parking ticket scandal except when just "passing in the hallway."

Captain Guilbeault testified specifically that she spoke to Mr. Jacob on the phone on December 14, 2013 but could not remember why she made that call. It was her testimony that she believed the call was "work-related" with respect to

---

[13]     In Media General's answers to Captain Henry's first set of interrogatories, it was stated that Mr. Taricani recalled that Mr. Jacob told him that he had heard of Captain Henry's involvement in the parking ticket scandal and that Mr. Jacob had then confirmed as much with his sources in the Cranston Police Department.

requests he had made of her in her role as the "planning and research captain;" she testified that she did not talk to Mr. Jacob about the parking ticket scandal. Captain Guilbeault also testified that the reason she exchanged numerous calls with Mr. Jacob was because there was "an issue with his records."

It was further her testimony that she did mention Captain Henry to Mr. Jacob in an email dated April 9, 2014, after the airing of the story at issue, in which she said that "they are working on getting stuff against Henry now;" she added that her basis for that statement was rumors going around the police station. It is clear from Captain Guilbeault's testimony that she objected to some actions of Chief Palombo as well as the work environment in the Cranston Police Department during the time period at issue.[14]

### E

### The Motions for Summary Judgment

On September 15, 2017, Media General, Mr. Lanni, and Mr. Taricani filed a motion for summary judgment alleging that Captain Henry was a public official and, as such, would be required to prove by clear and convincing evidence that any allegedly defamatory statement made about him was made with actual malice; they

---

[14] According to the decision of the hearing justice on defendants' motions for summary judgment, at the time of her deposition, Captain Guilbeault had a pending lawsuit against Captain Henry and the City; but, pursuant to a court order, any information with respect to that lawsuit was excluded from the scope of the deposition.

contended that Captain Henry could not meet that burden. Subsequently, Officer Leclerc and Captain Guilbeault also moved for summary judgment. Mr. Jacob filed a motion to dismiss that was converted by the hearing justice to a motion for summary judgment without objection. A hearing on the several motions was held on January 12, 2018.

Thereafter, on April 4, 2018, the hearing justice issued a written decision. The hearing justice began his analysis by addressing whether or not Captain Henry was a public official. He stated that that was a question of law, and he expressly observed that "[i]n Rhode Island, police officers have been held to be public officials for the purpose of defamation actions." He added that the facts of this case "strongly support finding that Plaintiff was a public official."

Accordingly, the hearing justice proceeded to address whether or not Captain Henry could prove, by clear and convincing evidence, that defendants acted with actual malice in disseminating the allegedly defamatory information at issue. He began this portion of his decision by holding as follows with respect to Media General, Mr. Lanni, and Mr. Taricani:

> "Taking all the evidence in the light most favorable to the Plaintiff can only establish that the story was wrong and that Mr. Taricani might have done further investigation. That in and of itself is not actual malice. Plaintiff has failed to show that there is sufficient clear and convincing evidence upon which a jury could find that [Media General, Mr. Lanni, and Mr. Taricani] had actual malice or displayed a reckless disregard for the truth."

- 18 -

The hearing justice went on to address the situation of Captain Guilbeault, holding that "[w]hile there [was] evidence of a grudge between Captain Guilbeault and Plaintiff * * * there [was] no evidence other than pure speculation that suggest[ed] Captain Guilbeault knew the information she allegedly provided Mr. Jacob was false;" he added that plaintiff had failed to show that there was clear and convincing evidence on the basis of which a jury could find actual malice with respect to Captain Guilbeault. With respect to Officer Leclerc, the hearing justice held that Captain Henry had likewise failed to meet his "substantial burden to prove actual malice." (Internal quotation marks omitted.) Lastly, as to Mr. Jacob, the hearing justice held that "[p]laintiff has offered no evidence that suggests Mr. Jacob entertained serious doubts about the accuracy of the information he provided to Mr. Taricani," since his alleged source—Captain Guilbeault—appeared reliable and credible.

Finally, the hearing justice held that the other counts in Captain Henry's complaint also failed because Captain Henry's "defamation claim cannot be rebaptized as another tort to evade the protections of the First Amendment."

Final judgment entered in defendants' favor on April 11, 2018. A timely notice of appeal was filed.

- 19 -

## II

## Standard of Review

This Court reviews a hearing justice's grant of a motion for summary judgment in a *de novo* manner. *Lynch v. Spirit Rent-A-Car, Inc.*, 965 A.2d 417, 424 (R.I. 2009); *see also Deutsche Bank National Trust Company for Registered Holders of Ameriquest Mortgage Securities, Inc. v. McDonough*, 160 A.3d 306, 311 (R.I. 2017). "We review the evidence in a light most favorable to the nonmoving party and will affirm the judgment if there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Lynch*, 965 A.2d at 424. "The party opposing summary judgment bears the burden of proving, by competent evidence, the existence of facts in dispute." *Cullen v. Lincoln Town Council*, 960 A.2d 246, 248 (R.I. 2008) (internal quotation marks omitted). "[T]he opposing part[y] will not be allowed to rely upon mere allegations or denials in [the] pleadings[ ] [but] [r]ather, by affidavits or otherwise [the opposing party has] an affirmative duty to set forth specific facts showing that there is a genuine issue of material fact." *The Providence Journal Co. v. Convention Center Authority*, 774 A.2d 40, 46 (R.I. 2001) (internal quotation marks omitted).

What is more, "summary judgment should enter 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case * * *.'" *Lavoie v. North East Knitting, Inc.*, 918 A.2d 225, 228 (R.I.

2007) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also Deutsche Bank National Trust Company*, 160 A.3d at 311. "Demonstrating mere factual disputes will not defeat summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Deutsche Bank National Trust Company*, 160 A.3d at 311 (emphasis in original) (internal quotation marks omitted).[15]

### III

### Analysis

### A

### Public Official

"The constitutional guarantees require * * * a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—

---

[15] It should be noted that, while the standards applicable to motions filed pursuant to Rule 56 of the Superior Court Rules of Civil Procedure must always be adhered to, summary judgment is a particularly appropriate procedural mechanism in defamation cases. *See, e.g.*, *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) ("[T]his court has observed that summary proceedings are essential in the First Amendment area because if a suit entails long and expensive litigation, then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails.") (internal quotation marks omitted); *Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966) (emphasizing how essential summary judgment procedures are in the First Amendment arena); *ELM Medical Laboratory, Inc. v. RKO General, Inc.*, 532 N.E.2d 675, 680 (Mass. 1989) ("As this court has noted, summary judgment may be desirable in defamation cases to protect First Amendment rights, as the costs of litigation may induce an unnecessary and undesirable self-censorship.") (internal quotation marks omitted).

that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).

In order to determine whether the actual malice standard announced in *New York Times Co.* is applicable in this case, we must first address the initial question of whether or not Captain Henry was, at the time of the subject broadcast, a public official.

We begin by noting that "[t]he determination of whether a plaintiff is a public official is a question of law and is generally a function of the court." *Hall v. Rogers*, 490 A.2d 502, 505 n.3 (R.I. 1985) (citing *Rosenblatt v. Baer*, 383 U.S. 75, 88 (1966)); *see Pendleton v. City of Haverhill*, 156 F.3d 57, 67 (1st Cir. 1998) (Selya, J.) ("The *Rosenblatt* Court declared that it is for the trial judge in the first instance to determine whether the proofs show [the plaintiff] to be a 'public official,' * * * and it explained that ceding this responsibility to the bench reduced the chance that jurors might use the cloak of a general verdict to punish unpopular ideas or speakers * * *. Extrapolating from this pronouncement, a number of federal courts (including this one) have treated First Amendment status determinations as grist for the court's—not the jury's—mill.") (internal quotation marks omitted).

The United States Supreme Court, in *Rosenblatt v. Baer*, 383 U.S. 75 (1966), held that "the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have,

substantial responsibility for or control over the conduct of governmental affairs." *Rosenblatt*, 383 U.S. at 85. "Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees," the actual malice standard applies. *Id.* at 86.[16]

It is particularly pertinent to note that this Court has previously considered the application of the standard articulated by the Supreme Court in *Rosenblatt* to the questions of whether or not a police sergeant and a "special police officer" were public officials. *Hall*, 490 A.2d at 503. In *Hall*, we specifically held that the police officers were public officials because they qualified as such under the test in *Rosenblatt*. *Id.* at 504. We further relied upon the then-recent opinion of the United States Court of Appeals for the Tenth Circuit in *Gray v. Udevitz*, 656 F.2d 588 (10th Cir. 1981), in which that court likewise determined that a police officer was a public official. *Hall*, 490 A.2d at 504 (citing *Gray*, 656 F.2d at 591). In *Hall*, we noted that, in *Gray*, the court had reasoned that a police officer qualified as a public official under the *Rosenblatt* standard because of the officer's authority and ability to use

---

[16]     *See also Mangual v. Rotger-Sabat*, 317 F.3d 45, 65 (1st Cir. 2003) ("The [Supreme Court] originally defined 'public official' narrowly * * * [but] [i]n practice, the term is now used more broadly and includes many government employees, including police officers.").

- 23 -

force and the fact that "misuse of that authority can result in significant deprivation of constitutional rights and personal freedoms, as well as bodily injury and financial loss." *Id.* (citing *Gray*, 656 F.2d at 591). We further stated in *Hall* that both the spirit of the doctrine articulated in *New York Times Co.* and decisions in later cases supported "the classification of police officers as public officials." *Id.* at 505.

Thus, it is eminently clear to this Court that, under our precedent in *Hall*, Captain Henry, as a then-lieutenant in the Cranston Police Department, was a public official.

However, Captain Henry invites this Court to revisit *Hall*. More specifically, he contends that "*Hall*'s blanket rule for all police officers misreads the United States Supreme Court's pertinent case law." He further avers that this Court in *Hall* announced "a *per se* rule that *all* police officers are public officials" and that, in fact, under *New York Times Co.* and *Rosenblatt*, it would be more appropriate to apply a case-by-case test. (Emphasis in original.)

After careful consideration of the various applicable legal precedents, we find ourselves entirely unable to agree with any portion of Captain Henry's argument in this regard. In *Hall*, we specifically applied the test provided for in *Rosenblatt*, and we do not read that opinion (or the underlying *New York Times Co.* opinion itself) to, in any way, require a case-by-case analysis with respect to the question of whether or not a police officer is a public official. *See Hall*, 490 A.2d at 504. Nor,

we might add, is Captain Henry able to point to any persuasive support for his suggestion, apart from dicta contained in one particular decision of the United States Court of Appeals for the Sixth Circuit.[17] What is more, this Court's decision in *Hall* is in line with the vast weight of authority from around the country.[18]

---

[17] Captain Henry relies on the opinion of the United States Court of Appeals for the Sixth Circuit in *Young v. Gannett Satellite Information Network, Inc.*, 734 F.3d 544 (6th Cir. 2013). In that opinion, the court expressly stated that it did not need to decide the issue of whether or not Sergeant James Young was a public official because he had conceded that he fell into that category. *Young*, 734 F.3d at 549. In dicta, the court then noted that some other cases which had found a police officer to be a public official involved officers of higher rank than Sergeant Young. *Id.* at 549-50. It suggested, without deciding the issue, that, were it not for the concession by the plaintiff, perhaps the case before the court should not have been decided under the actual malice standard. *Id.* Were the Sixth Circuit to have found it necessary to actually decide the issue and had it then determined that Sergeant Young was not a public official, its decision would certainly have been very much an outlier. *See* footnote 18, *infra*.

[18] *See, e.g.*, *St. Amant v. Thompson*, 390 U.S. 727, 730 n.2 (1968) (deputy sheriff); *McGunigle v. City of Quincy*, 835 F.3d 192, 206 (lst Cir. 2016) (police officer); *McKinley v. Baden*, 777 F.2d 1017, 1021 (5th Cir. 1985) (police officer); *Meiners v. Moriarity*, 563 F.2d 343, 352 (7th Cir. 1977) (government agents); *Mercer v. City of Cedar Rapids*, 308 F.3d 840, 848 (8th Cir. 2002) (police officer); *Gray v. Udevitz*, 656 F.2d 588, 591 (10th Cir. 1981) (police officer); *Seymour v. A.S. Abell Co.*, 557 F. Supp. 951, 957 (D. Md. 1983) (state police sergeant); *Hildebrant v. Meredith Corp.*, 63 F. Supp. 3d 732, 745 (E.D. Mich. 2014) (police officers); *Cibenko v. Worth Publishers, Inc.*, 510 F. Supp. 761, 765 (D.N.J. 1981) (Port Authority police officer); *Roberts v. Dover*, 525 F. Supp. 987, 990 (M.D. Tenn. 1981) (state highway patrolman); *Jackson v. Filliben*, 281 A.2d 604, 605 (Del. 1971) (police sergeant); *Smith v. Russell*, 456 So.2d 462, 463-64 (Fla. 1984) (police officer); *Reed v. Northwestern Publishing Co.*, 530 N.E.2d 474, 480 (Ill. 1988) (police officer); *Rawlins v. Hutchinson Publishing Co.*, 543 P.2d 988, 992 (Kan. 1975) (police officer); *Smith v. Danielczyk*, 928 A.2d 795, 805 (Md. 2007) (police officers); *Rotkiewicz v. Sadowsky*, 730 N.E.2d 282, 288-89 (Mass. 2000) (state police trooper); *Britton v. Koep*, 470 N.W.2d 518, 524 (Minn. 1991) (county

Not only are we in unequivocal agreement with the reasoning in *Hall*, but we are also mindful of the venerable principle of *stare decisis*. Accordingly, we emphatically decline to depart from our precedent in *Hall*. *See Johnston Ambulatory Surgical Associates, Ltd. v. Nolan*, 755 A.2d 799, 807 (R.I. 2000) ("The doctrine of *stare decisis* dictates that courts should adopt the reasoning of earlier judicial decisions if the same points arise again in litigation."); *see also Air Distribution Corp. v. Airpro Mechanical Co., Inc.*, 973 A.2d 537, 541 n.6 (R.I. 2009) ("Although it is not a jurisprudential principle that admits of absolutely no exceptions, the principle of *stare decisis* is nonetheless one of the most basic norms in our legal system."). Captain Henry has failed to provide us with any convincing argument for abandoning the principle established in *Hall*, and we certainly do not perceive any reason for doing so.[19]

Accordingly, having taken into account the voluminous precedent from the United States Supreme Court, from this Court, and from other courts, it is our

---

probation officer); *National Association for the Advancement of Colored People v. Moody*, 350 So.2d 1365, 1369 (Miss. 1977) (highway patrol officer); *McClain v. Arnold*, 270 S.E.2d 124, 125 (S.C. 1980) (police officer); *Colombo v. Times-Argus Association, Inc.*, 380 A.2d 80, 83 (Vt. 1977) (police officer/detective).

[19] It should go without saying that recent distressing events in this country relating to the conduct of police officers serve to remind us of the importance of media scrutiny of the actions of police officers. *See Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 491-92 (1975).

unequivocal holding that Captain Henry was a public official at the time of the broadcast at issue.

**B**

**Actual Malice**[20]

Having established that Captain Henry was indeed a public official at the time of the broadcast in question, it now becomes our role to determine if the broadcast was made with actual malice.[21]

**1. The Applicable Precedent**

In determining whether or not the broadcast was made with actual malice, we "must make an independent examination of the whole record * * *." *New York Times Co.*, 376 U.S. at 285 (internal quotation marks omitted); *see also Horne v. WTVR, LLC*, 893 F.3d 201, 210-11 (4th Cir. 2018) ("This Court * * * reviews whether there was sufficient evidence of 'actual malice' de novo.").

---

[20]    A good explanation of what "actual malice" is and what it is not can be found in *Reliance Insurance Co. v. Barron's*, 442 F. Supp. 1341 (S.D.N.Y. 1977).

[21]    Bearing in mind the parameters established in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), we have determined that this case involves: (1) a defamatory falsehood (a point conceded by defendants solely for the purposes of the motions for summary judgment, *see* footnote 6, *supra*); and (2) a situation in which the falsehood related to the official duties of Captain Henry, who was a public official. *See New York Times Co.*, 376 U.S. at 279-80. All that is left for us to consider is whether or not defendants acted with actual malice. *See id.*

Actual malice must be proved by clear and convincing evidence, and "whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law." *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 659, 685 (1989); *see Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 511 n.30 (1984); *see also Cullen v. Auclair*, 809 A.2d 1107, 1111 (R.I. 2002).

The United States Supreme Court has held that "[w]hen determining if a genuine factual issue as to actual malice exists in a libel suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times*"—*i.e.*, "the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).[22] As such, "there is no genuine issue if the evidence presented * * * is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence." *Id.*; *see also Harte-Hanks Communications, Inc.*, 491 U.S. at 686 ("[Judges] have a duty to independently decide whether the evidence in the record

---

[22] The language from *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), that is quoted in the text speaks of a "public figure" plaintiff. However, in our view, the principles enunciated in *Anderson* apply with equal force to "public official" plaintiffs. *See, e.g., Curtis Publishing Co. v. Butts*, 388 U.S. 130, 163 (1967) (Warren, C.J., concurring) ("To me, differentiation between 'public figures' and 'public officials' * * * [has] no basis in law, logic, or First Amendment policy.").

is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of actual malice.") (internal quotation marks omitted). In assessing the motions for summary judgment under the clear and convincing evidence standard, we must also keep in mind that "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, it is also true that "[t]he movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Id.* at 256. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

The United States Supreme Court has stated, with respect to the values which form the basis of the actual malice standard articulated in *New York Times Co.*, that "[t]he maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system." *New York Times Co.*, 376 U.S. at 269 (internal quotation marks omitted); *see also Bridges v. California*, 314 U.S. 252, 265 (1941) ("[T]he only conclusion supported by history is that the unqualified prohibitions laid down by the framers were intended to give to liberty of

the press * * * the broadest scope that could be countenanced in an orderly society."). Indeed, the guarantees embodied in the First Amendment, among them freedom of speech and freedom of the press, reflect a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co.*, 376 U.S. at 270; *see also Edwards v. National Audubon Society, Inc.*, 556 F.2d 113, 115 (2d Cir. 1977) ("In a society which takes seriously the principle that government rests upon the consent of the governed, freedom of the press must be the most cherished tenet. * * * To preserve the marketplace of ideas so essential to our system of democracy, we must be willing to assume the risk of argument and lawful disagreement.") (internal quotation marks omitted).

A statement is made with actual malice when it is made with "knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co.*, 376 U.S. at 279-80; *see also Alves v. Hometown Newspapers, Inc.*, 857 A.2d 743, 751 (R.I. 2004). The Supreme Court, after noting that reckless disregard "cannot be fully encompassed in one infallible definition," proceeded in *St. Amant v. Thompson*, 390 U.S. 727 (1968), to elucidate that all-important definition. *St. Amant*, 390 U.S. at 730-31. In that case, the Supreme Court stated that its previous opinions had made it "clear that reckless conduct is not measured by whether a

reasonably prudent man would have published, or would have investigated before publishing[;] [rather,] [t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Id.* at 731; *see also Harte-Hanks Communications, Inc.*, 491 U.S. at 667. Additionally, it is "worth emphasizing that the actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term," but instead requires that a plaintiff show that the defendant "made the false publication with a high degree of awareness of * * * probable falsity * * *." *Harte-Hanks Communications, Inc.*, 491 U.S. at 666, 667; *see also Major v. Drapeau*, 507 A.2d 938, 941 (R.I. 1986). The standard itself is subjective. *Harte-Hanks Communications, Inc.*, 491 U.S. at 688; *see Jankovic v. International Crisis Group*, 822 F.3d 576, 589 (D.C. Cir. 2016); *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1508 (D.C. Cir. 1996).

A defendant in a defamation action cannot "automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. * * * Nor will [a defendant] be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation[ ] [or] * * * where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant*, 390 U.S. at 732; *see Harte-Hanks Communications, Inc.*, 491 U.S. at 688. At the same time, however,

- 31 -

American courts have manifested an awareness of the constitutional values at stake when a defamation case is somewhat close. *See Liberty Lobby, Inc. v. Pearson*, 390 F.2d 489, 491 (D.C. Cir. 1967) ("While the right of expression and publication is not absolute, the balance is always weighted in favor of free expression * * * and tolerance for error is afforded; some utterances are protected not because of their merit or truth but because a free, open society elects to take calculated risks to keep expression uninhibited.").

### 2.  Captain Henry's Contentions on Appeal

Captain Henry contends on appeal that there is "ample reason to conclude that the Defendants published false facts about the Plaintiff with 'actual malice * * *.'" He points to the fact that Mr. Taricani twice spoke with Chief Palombo, who denied Captain Henry's involvement in the parking ticket scandal, and he further points to the fact that Mr. Taricani failed to mention that denial in his report.  He also alleges that Mr. Taricani's "weak attempts to reach the Plaintiff prior to publication * * * support[ ] the inference that he would rather not have heard Plaintiff's response to his questions."  He also asserts that Mr. Taricani testified at his deposition that he should have done more to contact Captain Henry before the report aired.

Captain Henry further points out that Mr. Taricani knew that neither of his sources had firsthand knowledge of Captain Henry's involvement in the parking ticket scandal but instead were reporting rumors.  Captain Henry also avers that Mr.

Taricani's on-air claim that his sources were close to the parking ticket investigation "had no apparent basis in fact" because Officer Leclerc testified that he did not tell Mr. Taricani that he was close to the investigation; and, in addition, Mr. Taricani was aware that Mr. Jacob bore some animosity towards the Cranston Police Department and, at the pertinent time, lived hundreds of miles away from Cranston. Captain Henry additionally points out that Mr. Taricani testified that the language "'cover their tracks'" in the news report at issue was likely not written by him but rather was added by a producer to make the report "'a little more juiced-up,'" which Captain Henry posits is evidence of reckless disregard for the truth. He further avers that Mr. Taricani "admitted that he knew of factions within the department, suggesting further reason to question the motivation of reports he was receiving."

It is Captain Henry's contention that all of the just-mentioned factors, taken together, are indicative of a genuine issue of material fact with respect to actual malice; he argues that "a jury could find by clear and convincing evidence that [Mr.] Taricani had obvious reason to doubt * * * the rumors that were passed on to him and he chose not to look further because he did not want to find further facts that would contradict his 'juiced up' report." In Captain Henry's view, the hearing justice failed to see "the mosaic of reckless disregard that emerges from the whole picture."

Captain Henry also contends on appeal that the hearing justice impermissibly failed to draw inferences in his favor as shown by the hearing justice's failure to infer: (1) that Mr. Taricani's testimony about not speaking to Captain Henry before publication because he didn't think it was a "'big deal'" was evidence of reckless disregard; (2) that disregarding Chief Palombo's denials was evidence of reckless disregard; (3) that the act of "pulling" the story was evidence of recklessness and an attempt to avoid accountability; and (4) that Captain Guilbeault's purported "grudge" against Captain Henry supported an "inference of malice."

### 3. Discussion

Captain Henry makes an impassioned argument to the effect that there is sufficient evidence in this case to allow a reasonable juror to conclude that defendants acted with actual malice. However, after our independent examination of the record and careful reflection, we are unpersuaded. It appears to us that, in his briefing before this Court, Captain Henry, while acknowledging that the applicable standard is that of actual malice, actually proceeds to apply a negligence standard to this case. Actual malice is not measured by what a reasonable, prudent person would do, nor is it measured by a showing of ill will or of malice in the ordinary sense. *See St. Amant*, 390 U.S. at 731; *see also Harte-Hanks Communications, Inc.*, 491 U.S. at 666-67. Actual malice requires something quite different; it requires a showing of knowledge of the falsity of the defamatory statement or reckless disregard for

- 34 -

whether or not it is false. *See New York Times Co.*, 376 U.S. at 279-80. It creates an exceptionally high hurdle for a defamation plaintiff to overcome. *See McFarlane*, 91 F.3d at 1515 ("[T]he standard of actual malice is a daunting one.") (internal quotation marks omitted).

In assessing whether or not Captain Henry has cleared that hurdle, we begin by looking specifically at the media defendants—Media General, Mr. Lanni, and Mr. Taricani.[23]

In our opinion, after a thorough review of the record as well as Captain Henry's contentions and the applicable legal precedent, we would be hard-pressed to identify even a scintilla of evidence that would be the basis for a rational factfinder to conclude by clear and convincing evidence that the media defendants acted with actual malice in airing the story at issue. And it should be recalled that a "scintilla of evidence" is insufficient to overcome the instant motions for summary judgment. *Anderson*, 477 U.S. at 252. Mr. Taricani relied on the information which he received from two sources in reporting the story at issue; the deposition testimony and other documents in the record reflect that one or both of those sources specifically named

---

[23] We pause to note that it is clear from contemporary news reports that the Cranston parking ticket scandal was deemed by the public to be of considerable importance. *See, e.g.*, Gregory Smith, *Until November ticket blitz, Cranston police had little use for overnight parking ban*, The Providence Journal (Jan. 25, 2014), https://www.providencejournal.com/article/20140125/NEWS/301259990 (last visited July 7, 2021).

Captain Henry and spoke of what they indicated was his purported involvement in the parking ticket scandal. Mr. Taricani testified at his deposition that he believed Officer Leclerc to be a credible source because Officer Leclerc had given him information previously about the parking ticket scandal, which information Mr. Taricani had been able to verify from public records. What is more, Mr. Taricani testified that he asked Officer Leclerc what he thought of Mr. Jacob (and he stated that he might have asked another officer as well) and was told that he was a "good cop." He also testified that he believed Mr. Jacob in view of the fact that Mr. Jacob told him that he had been talking with people inside the Cranston Police Department.[24] The mere fact that Mr. Jacob may have had some animosity towards

---

[24] We note that Captain Henry points to the fact that the story at issue stated that it was based on "[t]wo sources familiar with the ticket scandal investigation," while Officer Leclerc testified at his deposition that he "never used those words" when speaking to Mr. Taricani. Captain Henry contends that that denial establishes that there was no basis in fact for that portion of the story. However, even if we accept Officer Leclerc's testimony as true, Mr. Taricani knew that he had already received correct, verifiable information about the parking ticket scandal from Officer Leclerc and the information which he was receiving from Officer Leclerc and Mr. Jacob was consistent with each other. Given those facts, stating that his sources were familiar with the investigation did not rise to the level of actual malice; it may have been at most a deviation from ideal journalistic standards, but that does not equate with actual malice. *See Newton v. National Broadcasting Co., Inc.*, 930 F.2d 662, 669 (9th Cir. 1990) ("Even an extreme departure from accepted professional standards of journalism will not suffice to establish actual malice * * *.").

Captain Henry additionally points to the fact that Mr. Taricani testified at his deposition that the "'cover their tracks'" portion of the story at issue must have been added by a producer to "'juice[ ] up'" the story as evidence of reckless disregard for the truth. We disagree. The simple fact that a producer may have added the "'cover their tracks'" language does not reflect a knowledge of the falsity of the statements

- 36 -

the Cranston Police Department does not, standing alone, make Mr. Taricani's reliance on Mr. Jacob's information unreasonable.

What is more, it is important to note that Mr. Taricani testified that he subjectively believed the story to be true at the time of publication. *See Harte-Hanks Communications, Inc.*, 491 U.S. at 688; *see also Moffatt v. Brown*, 751 P.2d 939, 941 (Alaska 1988). It is not case-determinative that Officer Leclerc and Mr. Jacob may have been passing on mere rumors; reporting those rumors without further investigation, even if they turned out to be erroneous, may perhaps have been negligent, but it was certainly not evidence of actual malice. *See Harte-Hanks Communications, Inc.*, 491 U.S. at 688 ("[F]ailure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard."); *St. Amant*, 390 U.S. at 731 ("[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing."); *see also Hall*, 490 A.2d at 505 ("Failure to verify information, standing alone, does not constitute recklessness.").

---

in the broadcast at issue or a reckless disregard for their truth or falsity; in our opinion, that language simply constituted a reasonable inference based on the information Mr. Taricani obtained from his sources about the involvement of Captain Henry and Captain Antonucci in the parking ticket scandal. *See, e.g., Tavoulareas v. Piro*, 817 F.2d 762, 796 (D.C. Cir. 1987) (en banc) ("In our view * * * managerial pressure to produce [sensationalistic] stories cannot, as a matter of law, constitute evidence of actual malice."). Moreover, we additionally note that that very minute portion of the broadcast was not directly defamatory with respect to Captain Henry.

Indeed, there is nothing in the record of this case to show that Mr. Taricani's reliance on his two sources and his reasons for finding them to be credible were in any way reckless or that he had any serious doubts as to the veracity of what they were relating to him.[25]  *See St. Amant*, 390 U.S. at 731.  He simply relied on two sources whom he reasonably deemed to be credible.  "*New York Times* and its progeny protect journalists and publishers from liability based on errors of fact that arise from reliance on a credible source."  *Newton v. National Broadcasting Co., Inc.*, 930 F.2d 662, 682 (9th Cir. 1990); *see Hall*, 490 A.2d at 505 (holding that the source in question was credible in part because he had been relied on previously and had been found to be credible in that earlier instance); *see also Lyons v. Rhode Island Public Employees Council 94*, 559 A.2d 130, 131, 135 (R.I. 1989) (noting that, in distributing reprints of an older article, the publishing party relied on the credibility of the original author "as a syndicated columnist").  We would reiterate what we said in *Hall*: "As long as the sources of the libelous information appeared reliable, and the defendant had no doubts about its accuracy, the courts have held the evidence of malice insufficient to support a jury verdict, even if a more thorough investigation

---

[25]  It is true, as Captain Henry points out, that Mr. Taricani did know that neither of his sources had firsthand knowledge of Captain Henry's involvement, but that does not rise to the level of showing that a reasonable jury could find actual malice by clear and convincing evidence.  In our opinion, it is frankly inconsistent with established First Amendment principles to suggest that a reporter and news agency could not rely on any informant who did not have firsthand knowledge of what he or she was relating to the reporter.

might have prevented the admitted error." *Hall*, 490 A.2d at 505 (quoting *Ryan v. Brooks*, 634 F.2d 726, 734 (4th Cir. 1980)); *see also Lyons*, 559 A.2d at 136.

Thus, despite Captain Henry's contentions to the contrary, the media defendants' reliance on Mr. Taricani's sources without any additional investigation, such as looking for confirmation of the information which his sources provided him or making greater efforts than he did make to contact Captain Henry before the airing of the story at issue, did not rise to the level of actual malice. *See Newton*, 930 F.2d at 669 ("Even an extreme departure from accepted professional standards of journalism will not suffice to establish actual malice; nor will any other departure from reasonably prudent conduct, including the failure to investigate before publishing.").[26]

It remains an established principle that purposeful avoidance of the truth can support a finding of actual malice, but that clearly was not what happened in this case. *See Harte-Hanks Communications, Inc.*, 491 U.S. at 692-93. Contrary to Captain Henry's assertion, the fact that Chief Palombo twice denied Captain Henry's involvement in the parking ticket scandal to Mr. Taricani certainly does not amount to evidence of purposeful avoidance of the truth. Indeed, "liability under the clear and convincing proof standard of *New York Times v. Sullivan* cannot be predicated

---

[26] We note as well that Mr. Lanni testified at his deposition that "[i]n an environment like this, it's really difficult to get non-data driven information confirmed."

- 39 -

on mere denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." *Edwards*, 556 F.2d at 121 (internal quotation marks omitted); *see also Lohrenz v. Donnelly*, 350 F.3d 1272, 1285 (D.C. Cir. 2003); *see generally* Rodney A. Smolla, 1 *Law of Defamation* § 3:65.50 (2d ed.) (May 2021 Update) ("[A] reporter need not believe self-serving denials[;] * * * [a] denial only serves to buttress a case for actual malice when there is something in the content of the denial or supporting evidence produced in conjunction with the denial that carries a doubt-inducing quality.") (internal quotation marks omitted). As the hearing justice stated, "[h]istory recounts the stories of many high officials whose denials were proven false by low level sources." It cannot plausibly be deemed to have been reckless for the media defendants to have aired Mr. Taricani's story simply because Chief Palombo had denied Captain Henry's involvement. *Cf. Harte-Hanks Communications, Inc.*, 491 U.S. at 691, 693 (holding the evidence to have been sufficient to support a finding of actual malice because the published facts at issue were denied by *six* witnesses prior to publication and the newspaper which published them *failed to listen to tapes of a pertinent interview* which were provided to it before publishing the story at issue). To hold otherwise with respect to unsubstantiated denials would unsettle the bedrock on which investigative journalism and freedom of the press are founded.

Nor, we would add, is a retraction of the story at issue automatically an indication of actual malice.  In fact, it has been asserted that "[t]he issuance of a prompt retraction may be utilized by a defendant to prove the *absence* of actual malice."  Smolla, 1 *Law of Defamation* at § 3:81 (emphasis added); *see, e.g.*, *Logan v. District of Columbia*, 447 F. Supp. 1328, 1332 (D.C. 1978) ("[T]he correction published the next day by the *Post* is significant and tends to negate any inference of actual malice.") (internal quotation marks omitted).

Finally, we would note that, in our view, there was no portion of the information which was relayed to Mr. Taricani that was inherently improbable or for which there would be obvious reasons to doubt the veracity thereof.  *See St. Amant*, 390 U.S. at 732.

We have conducted an independent examination of the record in this case, and we have carefully reviewed ample legal precedent.  In doing so, we have taken Captain Henry's evidence as true, making every justifiable inference in his favor. *See Anderson*, 477 U.S. at 255.  It is our conclusion that there is insufficient evidence upon which a reasonable jury could find, by clear and convincing evidence, that the actions of the media defendants (even when taken as a whole) would support a conclusion by a rational factfinder that they were taken with knowledge of the falsity of Captain Henry's involvement in the parking ticket scandal or with reckless

disregard as to the truth thereof.[27]  With respect to the media defendants, Captain Henry has thus failed to establish an evidentiary basis upon which a finding of actual malice could rationally be predicated, as the constitutionalized law of defamation unequivocally requires him to do.

We now turn to Officer Leclerc.  According to Officer Leclerc's deposition testimony, he overheard two separate conversations which mentioned Captain Henry's involvement in the parking ticket scandal, although he did not know the identity of the individuals he overheard.  He further testified that he knew Captain Antonucci and Captain Henry were related, were on the police union's executive board together, and stood to be deprived of a substantial monetary gain as a result of

---

[27]  We pause to briefly address Captain Henry's contention that Mr. Taricani's statements in the report at issue and his testimony contradicted Officer Leclerc's testimony, thus creating an issue of fact for a factfinder.  We are in full agreement with the media defendants' rebuttal to this argument: "The question before this Court is whether the record currently contains clear and convincing evidence of actual malice, such that a reasonable fact finder *could* find that the Media Appellees acted with actual malice based on the record below, not whether there are *any* questions of fact about the particulars which [Captain] Henry alleges *as his evidence of* actual malice."  (Emphasis in original.)  Indeed, Captain Henry must prove not that there are inconsistencies among the deposition testimonies in this case but rather that, when his evidence is taken as true and every inference is drawn in his favor, that evidence is sufficient for a rational factfinder to find actual malice.  *See Anderson*, 477 U.S. at 248 ("Factual disputes that are irrelevant or unnecessary will not be counted."); *see also Deutsche Bank National Trust Company for Registered Holders of Ameriquest Mortgage Securities, Inc. v. McDonough*, 160 A.3d 306, 311 (R.I. 2017) ("Demonstrating mere factual disputes will not defeat summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original) (internal quotation marks omitted).

- 42 -

the City Council's failure to approve the police union contract proposal. It was his testimony that, for those reasons, he believed that the information he passed on to Mr. Taricani was true. *See Harte-Hanks Communications, Inc.*, 491 U.S. at 688 (stating that the actual malice standard is subjective). It is highly unlikely that this evidence would be sufficient for a jury to find that Officer Leclerc defamed Captain Henry even under a negligence standard; and it is certainly insufficient under the actual malice standard. *See id.* at 666-67; *St. Amant*, 390 U.S. at 731. Our conclusion is not altered by the fact that Officer Leclerc did not undertake any further investigation of the remarks that he overheard. Even given that fact, there is simply not sufficient evidence on which a rational factfinder could find that Officer Leclerc acted with actual malice. *See, e.g., Newton*, 930 F.2d at 669.

The same is true with respect to Mr. Jacob. It is true that Mr. Jacob was a disgruntled former employee of the Cranston Police Department, but that fact alone does not satisfy the actual malice standard. *See, e.g., Kidder v. Anderson*, 354 So.2d 1306, 1309 (La. 1978) ("That police officers were disgruntled and antagonistic to their proposed chief is not necessarily an indication of their unreliability as informants."). There is no evidence of any kind in this case to suggest that Mr. Jacob had any reason to doubt the veracity of his sources, even if he was merely "passing on rumors * * *." His actions may possibly have constituted negligence at most, but they certainly do not rise to the level of actual malice. *See Harte-Hanks*

*Communications, Inc.*, 491 U.S. at 666-67. In our judgment, the evidence with respect to Mr. Jacob is simply insufficient for a jury to rationally find that he acted with actual malice.

The final defendant for us to consider is Captain Guilbeault. The complaint alleges that Captain Guilbeault was Mr. Jacob's source for the information pertaining to Captain Henry, which information Mr. Jacob in turn provided to Mr. Taricani. Even assuming *arguendo* that she was the source, there is no evidence that she knew the information which she was providing to Mr. Jacob was false or that she conveyed it with reckless disregard as to its truth or falsity. *See New York Times Co.*, 376 U.S. at 279-80. The only even potentially relevant piece of information that Captain Henry points to is the fact that, according to the hearing justice's decision, Captain Guilbeault had a lawsuit pending against Captain Henry and the City of Cranston. Captain Henry also contends that Captain Guilbeault purportedly had a "grudge" against him. Those facts, even when assumed to be true, are clearly inadequate to support a determination that Captain Guilbeault acted with actual malice.[28] *See Harte-Hanks Communications, Inc.*, 491 U.S. at 666-67.

---

[28] Finally, we note that Captain Henry has endeavored to equate this case with that of *Goldwater v. Ginzburg*, 414 F.2d 324 (2d Cir. 1969). In our opinion, the two cases are radically distinguishable from one another. In *Goldwater*, the United States Court of Appeals for the Second Circuit held that the evidence at issue established that the appellants had acted with actual malice. *Goldwater*, 414 F.2d at 340. However, in that case, there was evidence of a "possible preconceived plan to attack Senator Goldwater regardless of the facts;" evidence that the only source for

In reaching our conclusion that there is no evidence in this case on which a rational juror could find that defendants acted with actual malice, we are cognizant of the following statement by the United States Supreme Court: "Neither lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation. But to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones." *St. Amant*, 390 U.S. at 732; *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974). Additionally, it is axiomatic that "the interest of a public figure in the purity of his reputation cannot be allowed to obstruct that vital pulse of ideas and intelligence on which an informed and self-governing people depend. It is unfortunate that the exercise of liberties so precious as freedom of speech and of the press may sometimes do harm that the state is powerless to recompense: but this is the price that must be paid for the blessings of a democratic way of life." *Edwards*, 556 F.2d at 122; *see Gertz*, 418 U.S. at 342 ("[W]e have been especially anxious to assure to the freedoms of speech and press that 'breathing space' essential to their fruitful exercise.") (internal quotation marks omitted); *see also Harte-Hanks Communications, Inc.*, 491 U.S. at

---

the conclusion that Senator Goldwater had a "paranoiac personality" was based on a "non-expert evaluation of Senator Goldwater's life and political career;" and evidence that numerous statements in the article at issue seemed to be wholly without support. *Id.* at 331-33, 340. No evidence remotely approaching that magnitude is present in the record of this far less egregious case.

686.  It is true that, when the media operate under the protection of the actual malice standard (as is the case when the subject of a broadcast is a public official or a public figure), mistakes will inevitably be made and individual reputations will sometimes be sullied.  That is regrettable, but inevitable—and hopefully rare.  *See Ryan*, 634 F.2d at 733 ("We recognize that the *New York Times* standard is a difficult one for libel plaintiffs to meet, and that its application may sometimes produce harsh results.").

Accordingly, because Captain Henry has failed to meet his burden in this case, we affirm the hearing justice's grant of defendants' motions for summary judgment with respect to the libel and slander claims against them (Counts One and Two).  *See Anderson*, 477 U.S. at 252, 256 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient * * *. * * * The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict.").

## C

### Captain Henry's Remaining Claims

Having determined that Captain Henry is a public official and that there is insufficient evidence upon which a rational factfinder could conclude that defendants acted with actual malice, we turn now to Captain Henry's other claims—

- 46 -

*viz.*, Count Three, which alleged "[v]iolation of R.I. Gen. Laws §9-1-28.1(a)(4)" by virtue of defendants "caus[ing] the Plaintiff to be placed before the public in a false position" (commonly referred to as a "false light" claim); and Count Four, which alleged negligent and intentional infliction of emotional distress.

These additional claims asserted by Captain Henry must also fail because of the basic principle in the domain of media law that "one may not breathe life into an otherwise doomed defamation claim by re-baptizing it as a different cause of action." *Trainor v. The Standard Times*, 924 A.2d 766, 769 n.1 (R.I. 2007); *see Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988) ("We conclude that public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publications such as the one here at issue without showing in addition that the publication contains a false statement of fact which was made with 'actual malice' * * *."); *Shay v. Walters*, 702 F.3d 76, 83 (1st Cir. 2012) (Selya, J.) ("The Supreme Court has made it pellucid that a failed defamation claim cannot be recycled as a tort claim for negligent or intentional infliction of emotional distress."); *Yohe v. Nugent*, 321 F.3d 35, 44 (1st Cir. 2003) (upholding the dismissal of the plaintiff's emotional distress claim because it was "premised on precisely the same facts as his defamation claim"); *Leidholdt v. L.F.P. Inc.*, 860 F.2d 890, 893 n.4 (9th Cir. 1988) ("An emotional distress claim based on the same facts as an unsuccessful libel claim cannot survive as an independent cause of action[.]"); *see also Correllas*

*v. Viveiros*, 572 N.E.2d 7, 13 (Mass. 1991) ("A privilege which protected an individual from liability for defamation would be of little value if the individual were subject to liability under a different theory of tort."). The United States Supreme Court has stated that this standard "reflects [the Court's] considered judgment that such a standard is necessary to give adequate 'breathing space' to the freedoms protected by the First Amendment." *Hustler Magazine, Inc.*, 485 U.S. at 56.

For these reasons, it is our unconditional opinion that, in the instant case, the hearing justice did not err in granting defendants' motions for summary judgment on all counts in the complaint.

This case is a classic example of the venerable maxim: "*Dura lex sed lex*" (It is a harsh law, but it is the law). While we are confident that we have correctly applied the constitutionally derived principles relative to defamation actions brought by public officials, we are not in the least insensitive to the unfortunate effect on the lives and reputations of real human beings that the application of those principles can sometimes have. Such is the price that some individuals must pay as a result of the daunting burden which public officials must bear when they seek to prevail in a defamation action. Our sympathy for public officials who allege that they are victims of defamation is unfeigned, but our role is to apply the constitutionally derived principles that are operative in this domain. *See, e.g.*, *Peterson v. New York Times Co.*, 106 F. Supp. 2d 1227, 1232-33 (D. Utah 2000) ("The court is in no way

attempting to trivialize the misfortune that [the plaintiff] has suffered. It takes a good part of one's lifetime to establish a good reputation, and when that hard-earned reputation is tarnished in a mere day by an unfortunate error, one is certain to be left in despair."); *see also Saenz v. Playboy Enterprises, Inc.*, 653 F. Supp. 552, 573 (N.D. Ill. 1987) ("Saenz joins a goodly company of public servants who have been pummeled by abusive charges. * * * The constitutional balance which has been struck does not, however, permit the use of the libel laws for the vindication he here seeks."), *aff'd*, 841 F.2d 1309 (7th Cir. 1988).

## IV

## Conclusion

Accordingly, we affirm the judgment of the Superior Court. We remand the record to that tribunal.

Justice Goldberg did not participate.



# STATE OF RHODE ISLAND
## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Russell Henry v. Media General Operations, Inc., et al. |
| **Case Number** | No. 2018-169-Appeal. (PC 14-2837) |
| **Date Opinion Filed** | July 8, 2021 |
| **Justices** | Suttell, C.J., Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Richard A. Licht |
| **Attorney(s) on Appeal** | For Plaintiff:<br><br>Thomas M. Dickinson, Esq.<br>Kathleen M. Hagerty, Esq. |
| | For Defendants:<br><br>Stephen E. Breggia, Esq.<br>Raymond A. Marcaccio, Esq.<br>Ryan C. Hurley, Esq. |